STERLING SAVINGS ASSOCIATION, a state-chartered savings association, Plaintiff,

v.

T. Timothy RYAN, Director, Office of Thrift Supervision, in his own official capacity and as successor in interest to the Federal Home Loan Bank Board; Federal Home Loan Bank of Seattle, and the Federal Deposit Insurance Corporation, in its own capacity and as successor in interest to the Federal Savings and Loan Insurance Corporation, Defendants.

No. CS–90–0175–JLQ.

United States District Court, E.D. Washington.

Aug. 8, 1990.

Memorandum Opinion and Order Granting in Part and Denying in Part Motion to Reconsider Nov. 2, 1990.

William D. Symmes, Leslie R. Weatherhead, Witherspoon, Kelley, Davenport & Toole, Spokane, Wash., for plaintiff.

Aaron B. Kahn, Edward J. O'Meara, Office of the Chief Counsel, Office of Thrift Supervision, Washington, D.C., for T. Timothy Ryan.

George W. Akers, Montgomery, Purdue, Blankinship & Austin, Seattle, Wash., for Federal Home Loan Bank of Seattle.

Carroll Gray, Asst. U.S. Atty., U.S. Atty., Spokane, Wash., Gary W. Herschman, U.S. Dept. of Justice, Civ. Div., Washington, D.C., for Federal Deposit Ins.

## MEMORANDUM OPINION AND ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION AND DENYING MOTION TO DISMISS, INTER ALIA

QUACKENBUSH, Chief Judge.

BEFORE THE COURT are the plaintiff Sterling Savings Association's ("Sterling") Motion for Preliminary Injunction (Ct.Rec. 16), the defendant Federal Home Loan Bank of Seattle's ("FHLB") Motion for Order of Dismissal (Ct.Rec. 37), and the defendant Director, Office of Thrift Management ("OTS") and defendant Federal Deposit Insurance Corporation's ("FDIC") Motion to Dismiss (Ct.Rec. 41), heard with oral argument on July 3, 1990. William D. Symmes and Leslie R. Weatherhead appeared on behalf of Sterling. Edward J. O'Meara represented OTS. Gary W. Herschman and Marta W. Berkley appeared on behalf of the FDIC. Having reviewed the record and heard from counsel, the court enters this Order to memorialize the oral rulings made at the hearing in this matter.

### Factual Background

Sterling is a state-chartered, federally insured stock savings association with headquarters in Spokane, Washington. Founded in 1983, Sterling has experienced relatively rapid expansion from its original single location to a present size of approximately 28 branch offices located throughout Washington State. Most of Sterling's management level employees, including Chairman Harold B. Gilkey, have been with Sterling from its inception and, from all indications, have managed to balance Sterling's propensity for growth with its goal

of realizing annual profits. Until the recent actions by federal regulators, Sterling appeared to enjoy a favored status in the eyes of both investors and regulators alike and was viewed as a refreshing ray of light in the otherwise dim environment of the thrift industry. This status and reputation, no doubt, were due in large part to the fact that Sterling was well managed and, unlike many troubled thrifts, was not burdened with principals who engaged in insider trading, made insider loans, or purchased expensive yachts and airplanes on behalf of the company.

Much of Sterling's growth can be attributed to various acquisitions of other thrift institutions within the same geographic region. Of relevance to this case are three particular instances in which Sterling, with the blessing and unbridled encouragement of federal regulators, acquired insolvent institutions that were on the verge of being, or already had been, placed in receivership. Armed with certain contractual agreements and promises from government regulators, and relying on the government's assurances, Sterling began the process of absorbing these failing thrifts into its then existing capital structure, thereby saving the Federal Savings and Loan Insurance Corporation ("FSLIC") the enormous expense and cost of liquidating the troubled thrifts and paying the claims of depositors.

The first of the three transactions occurred in 1985 when Sterling acquired Lewis Federal Savings and Loan Association ("Lewis Federal") located in Chehalis, Washington. Lewis Federal, at that point, was woefully insolvent and had been placed in receivership under the direction of the Federal Home Loan Bank Board ("FHLBB") and the FSLIC. At the request of federal regulators, Sterling submitted a successful bid for the acquisition of Lewis Federal and thereafter entered into a series of agreements with the FSLIC to consummate the deal. On November 4, 1985, the FHLBB issued a resolution in which it approved the proposed sale and authorized the FSLIC to execute both an Assistance Agreement and an Acquisition Agreement on behalf of Lewis Federal.

See Ct.Rec. 51, Exhibit D. These contracts were signed by the parties on November 5, 1985. See Ct.Rec. 51, Exhibits G & I. The resolution also authorized FHLBB's Secretary to issue a formal letter to Sterling granting certain forbearances from regulatory capital and accounting requirements. See Ct.Rec. 51, Exhibit D, at 6. The letter, issued on November 12, 1985, see Ct.Rec. 51, Exhibit C, and the Board's resolution were expressly referenced and saved in merger clauses contained in both the Assistance Agreement and the Acquisition Agreement. See Ct.Rec. 51, Exhibit G, § 17, at 10–11; Ct.Rec. 51, Exhibit I, § 14, at 27–28. More importantly, the letter states that the forbearances were granted "[i]n connection with" the negotiated acquisition by Sterling of the failed thrift. See Ct.Rec. 51, Exhibit C, at 1.

The second relevant acquisition occurred in April 1988 and, for all practical purposes, was identical to the Lewis Federal transaction. Tri–Cities Savings and Loan Association ("Tri–Cities"), like Lewis Federal, was an insolvent thrift that had been placed in receivership under the control of the FSLIC. Once again, hoping to avoid the serious adverse impact liquidation would have on an already insufficient federal insurance fund, federal regulators approached Sterling to suggest the acquisition of this second troubled thrift. Relying on the same promises and assurances previously offered in the Lewis Federal transaction, Sterling submitted the top bid for Tri–Cities and proceeded to finalize the acquisition. As before, the FHLBB authorized the sale and regulatory forbearances by resolution. See Ct.Rec. 51, Exhibit F. Both an Acquisition Agreement, see Ct.Rec. 51, Exhibit H, and an Assistance Agreement, see Ct.Rec. 51, Exhibit J, were executed between Sterling and the FSLIC, and a follow-up letter was provided by the Board Secretary detailing the regulatory capital and accounting practices to be followed by Sterling during the forbearance period, see Ct.Rec. 51, Exhibit E. Although all parties to the contracts were aware that, without these negotiated exceptions, the acquisition would put Sterling's

capital base below regulatory standards, they were confident that Sterling could absorb the debt and return to normal operation after the plan had run its course.

This same confidence and respect were again apparent in December 1988 when Sterling acquired Central Evergreen Federal Savings and Loan Association ("Central Evergreen"). Like the previous two institutions, Central Evergreen was heavily in debt and considered insolvent even though a receiver had not been appointed. Unlike the prior transactions, however, the Central Evergreen acquisition was substantially unassisted and was not contingent on the same set of specific regulatory concessions by government regulators. That is not to say that the government opposed the merger. To the contrary; the regulators' requests for Sterling's assistance in this matter were persistent enough to weather at least one negative response before Sterling capitulated. Lengthy negotiations netted a resolution by the FHLBB approving the merger, see Ct.Rec. 51, Exhibit L, and an agreement between Sterling and the FSLIC in which Sterling promised to raise additional capital pursuant to a referenced Business Plan and the FSLIC agreed to give Sterling until December 31, 1990, to comply with existing capital to asset ratios. According to the Business Plan and the FHLBB resolution, the parties contemplated that Sterling would raise a substantial amount of capital through a public stock offering to be completed by June 30, 1989. See Ct.Rec. 51, Exhibit K, Attachment A. Once again, these measures were taken in light of the apparent realization that, as a result of the merger and other acquisitions of insolvent thrifts, Sterling would be temporarily unable to meet the ratios of capital to assets outlined in the federal regulations. With the contract in place, however, the final acquisition was complete and the parties settled on the task of carrying out the various duties and obligations under the negotiated agreements.

The first sign of trouble appeared on the horizon in late 1989 when Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). See Pub.L. No. 101–73, 103 Stat. 183. FIRREA was a congressional response to the "S & L crisis"—a shorthand term for the unprecedented failure of hundreds of thrift institutions throughout the country and the insolvency of the FSLIC's deposit insurance fund. One major consequence of the legislation was a wholesale restructuring of the regulatory framework in the thrift industry. FIRREA abolished the FHLBB and transferred all regulatory oversight powers and responsibilities to the newly established Office of Thrift Supervision ("OTS"). The FSLIC also was a fatality of FIRREA and the task of managing the recapitalized deposit insurance fund was assumed by the FDIC. The primary goal of the legislation, however, was to minimize the risk of continued insurance fund depletion caused by the failure of undercapitalized institutions. To that end, FIRREA imposed more stringent capital requirements and gave the Director of OTS broad enforcement powers to ensure that all thrifts were brought into compliance with the tightened regulatory controls.

From its inception, the OTS has interpreted FIRREA to require absolute compliance with the heightened capital standards by all thrifts without exception and without regard to previously negotiated capital and accounting treatment. In essence, the OTS views FIRREA as working a wholesale abrogation of the contracts and agreements entered into by its predecessor agency, including exceptions or forbearances from certain regulatory requirements. That the contracts purported to bind all successors is said by the government agencies to be irrelevant.

In late 1989 and early 1990, the OTS declared Sterling to be out of compliance and began imposing operating restrictions. At that time, Sterling was in the final stages of preparing for a major equity offering in the public capital markets; however, the offering was cancelled after it became clear that OTS would not ensure Sterling's authority and permission to pay shareholder dividends. The relationship between OTS and Sterling further deteriorated in May 1990 when Sterling refused to execute an operating agreement in

which it would have consented to the appointment of a conservator or receiver if a definitive merger agreement with another financial institution was not executed by May 31, 1990. *See* Ct.Rec. 43, Exhibit 7. Shortly thereafter, on May 15, 1990, Sterling filed the present action. *See* Ct.Rec. 1.

On May 28, 1990, this court granted the plaintiff's motion for a temporary restraining order, *see* Ct.Rec. 14, and noted a preliminary injunction hearing for June 21, 1990. The court found that serious questions were raised and that the need to maintain the status quo warranted the imposition of injunctive relief. By stipulation of the parties dated June 8, 1990, the temporary restraining order was extended to July 6, 1990, and the plaintiff's Motion for Preliminary Injunction was noted for hearing on the day set aside for resolving the defendants' Motion to Dismiss on July 3, 1990.

## Discussion

First and foremost, Sterling maintains that its negotiations with the FSLIC and the FHLBB prior to acquiring the insolvent thrifts precipitated binding and enforceable contracts that, far from being abrogated, were expressly saved under FIRREA. Sterling argues that the OTS's unyielding insistence on compliance with the newly created capital and accounting standards in this case has resulted in an unauthorized breach of contract; indeed, claims Sterling, not only is OTS acting without statutory authority, it is pursuing a policy that lies in direct contravention to its clear statutory mandate. In the alternative, and if FIRREA in fact abrogated and cancelled these contractual rights, Sterling argues that it has suffered a constitutional taking without just compensation in violation of its fifth amendment due process rights. In either instance, Sterling claims to be entitled to declaratory and injunctive relief precluding the OTS from exhibiting a continued disregard for the various agreements or, in the alternative, allowing Sterling to rescind the contracts, thereby reversing the acquisitions and bringing the institution into technical compliance with FIRREA's heightened capital standards.

The defendants' Motion to Dismiss is largely contingent on a finding by the court that (1) Sterling did not have any contractual assurance of receiving special capital and accounting treatment in conjunction with the acquisitions of the insolvent thrifts or (2) FIRREA, in fact, abrogated any and all prior contracts or agreements entered into by the predecessor agencies relating to forbearances from regulatory requirements. The defendants concede that the court has jurisdiction to resolve this limited "statutory claim." *See* Ct.Rec. 57, at 18. They concede further that injunctive relief is warranted should the court rule adversely that the forbearances are contractual and are not preempted and superceded by FIRREA. *Id.* at 17. Thus, inasmuch as the court finds both the existence of a contractual relationship and the lack of a specific and unequivocal intent on the part of Congress to effect a taking, there is no need to reach the remaining jurisdictional arguments that constitute the core of the defendants' Motion to Dismiss. Such a finding likewise renders moot the plaintiff's constitutional claims. The sole issue at this point is whether the plaintiff has adequately established the various elements necessary to secure a preliminary injunction, concentrating specifically on how FIRREA impacts the negotiated agreements.

Under Ninth Circuit law, the party seeking a preliminary injunction bears the burden of meeting one of two tests. Under the "traditional" standard, a court may issue preliminary relief if it finds that (1) the moving party will suffer irreparable injury if the relief is denied; (2) the moving party will probably prevail on the merits; (3) the balance of potential harm favors the moving party; and (4) the public interest favors granting relief. *Cassim v. Bowen*, 824 F.2d 791, 795 (9th Cir.1987). Under the "alternative" standard, the moving party may satisfy its burden by demonstrating either (1) a combination of probable success and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. *Id.*

Though two tests are recognized, they are not mutually exclusive or wholly distinct. Rather, they are "extremes of a single continuum." *Wilson v. Watt*, 703 F.2d 395, 399 (9th Cir.1983). The critical element is the relative hardship to the parties. If the balance of hardships tips decidedly toward the plaintiff, a less substantial showing of a likelihood of success on the merits will suffice. *Id.* In every case, however, a plaintiff must establish at least some probability of success. "The irreducible minimum has been described by one court as a fair chance of success on the merits, while another court has said that the question must be serious enough to require litigation. The difference between the two formulations is insignificant. Therefore, we accept either as satisfactory." *Benda v. Grand Lodge of Intern. Ass'n.*, 584 F.2d 308, 315 (9th Cir.), *cert. dismissed*, 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979).

### A. Irreparable Injury/Balance of Hardships

The defendants correctly point out that, generally, mere financial injury does not constitute irreparable harm if adequate compensatory relief will be available at some later point in the litigation. *Goldie's Bookstore v. Superior Court of State of Cal.*, 739 F.2d 466, 471 (9th Cir.1984). Such a rule remains sound, however, only so long as the harm is reasonably calculable. *Id.* Thus, although mere speculative injury should not be considered, *see id.* at 472; *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 675 (9th Cir.1988), damage that appears relatively imminent and that does not lend itself well to monetary appraisal may suffice. *See, e.g., Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1377 (9th Cir.1985)

(loss of reputation); *Foremost International Tours v. Quantas Airways Ltd.*, 525 F.2d 281, 287 (9th Cir.1975) (severe decline in business).

It is undisputed in this case that OTS already has imposed operating and growth restrictions on Sterling based on OTS's determination that Sterling is capital deficient. *See* Ct.Rec. 43, Exhibit 7; Ct.Rec. 9, Exhibits 4–6. OTS's actions to date also have caused the cancellation of a planned equity offering that presumably would have brought Sterling into compliance with current FIRREA standards. *See* Ct.Rec. 51, at 12–13, 15–16; Ct.Rec. 49, at 7.[1] More disconcerting is the distinct possibility that Sterling will be the object of a take-over by government regulators. Obviously, OTS has not yet moved on Sterling in this manner. But at this point the court must focus on what is likely to happen, not simply on what has happened. Of particular concern in this regard are counsel's statements that, out of necessity, the appointment of a conservator or receiver will take place without warning, possibly overnight. The need, therefore, to assess the likelihood of a regulatory take-over is great.

The court finds that there is sufficient evidence of impending government action to warrant consideration of the effects of a take-over. By threatening regulatory sanctions, OTS already has attempted to coerce Sterling into consenting to the appointment of a conservator or receiver unless a merger was assured. While the intent of the regulators may never be known, the only reasonable interpretation of such action is that it was a "sell out or else" ultimatum. With the merger less than assured, Sterling and its investors understandably feared that the alternative was not long in coming. If that day were

---

**1.** As stated above, the stock offering was abandoned after Sterling failed to receive any assurance from OTS that Sterling would be allowed to pay dividends on the stock purchased. Through the testimony of Carol A. Friend, Assistant District Director of the OTS, the defendants pass the decision off as being in accord with the longstanding policy of government regulators not to give prior approval to dividend payments. The court, however, is satisfied that Sterling was not seeking express approval to pay future dividends per se, but rather was asking for some assurance that the OTS would not later refuse such permission based only on its rigid interpretation of FIRREA that Sterling must first satisfy contemporary capital requirements, ignoring entirely the negotiated agreements. Thus viewed, the relevant conduct of the OTS in this case is causally related to the failed stock offering.

to arrive, liquidation, with its resulting loss of jobs and investor money, would be a near certainty. *See* Ct.Rec. 9, at 3–4.

The court also finds that Sterling already has suffered immeasurable injury in the form of damage to reputation and the accompanying loss of business. Strong evidence of this is the fact that the value of Sterling's common stock has dropped in recent months from $9.00 per share to $4.00 per share. *See* Ct.Rec. 9, at 5.

The defendants argue that all of this injury and harm is not irreparable because Sterling can be compensated for any loss by filing an action in the Court of Claims. This assertion, however, evinces an extremely casual attitude on the part of federal regulators toward the rights of Sterling employees, investors, and depositors. Although, theoretically, the harm to these various interests might be compensated monetarily, common sense would dictate that, on a practical level, the true measure of the damage is beyond reasonable calculation. Indeed, the present harm to Sterling's reputation and the resulting loss of investor confidence and new business most likely will never be known. It is doubtful that the defendants, if subjected to a "straight face test," seriously could argue that such damage has not occurred. Thus, the court finds that the harm to Sterling is both immediate and irreparable. Against this finding the court must weigh any hardship an injunction likely would visit on the defendants.

While arguing on the one hand that Sterling's claimed damages are either speculative or monetarily compensable, the defendants contend on the other that they and the public's interest in ensuring adequately capitalized thrift institutions will be irreparably harmed by the issuance of an injunction. Although less than direct, the defendants imply that an order precluding the enforcement of FIRREA's capitalization requirements in this case will expose the public and the insurance fund to the imminent risk of yet another thrift failure. Not only does the court disagree, it finds the defendants' fears to be speculative beyond belief.

At the time federal regulators invited and induced Sterling to acquire the three failing thrift institutions, the FHLBB expressly found that the acquisitions and negotiated forbearances were in the public interest. *See, e.g.,* Ct.Rec. 51, Exhibit F, at 3. Moreover, there simply is no evidence or allegation in this case that Sterling has not lived up to those agreements or that Sterling is on the verge of insolvency. Indeed, the Resolution Trust Corporation ("RTC"), the agency in charge of liquidating insolvent thrifts, has consistently proclaimed Sterling's solvency and disclaimed any jurisdiction over Sterling's affairs. *See* Ct.Rec. 52, Exhibit A.

There also is no evidence to indicate that the officers of Sterling have engaged in questionable trading or loan practices or have shown the usual propensity for opulence that commonly is associated with failed savings and loan institutions. More important still is the uncontested fact that Sterling has shown a profit in each year of operation. With this track record, the defendants' implicit prediction of yet another thrift failure carries little weight. All available evidence indicates that Sterling's efforts to absorb the troubled thrifts were proceeding as planned and that the only intervening occurrence was the enactment of FIRREA. Yet the defendants would have this court find that, suddenly, with this single stroke of the legislative pen, Sterling's continued operation under the negotiated agreements was no longer in the public interest but, in fact, was threatening immediate and irreparable harm. The court rejects this lapse in logic and further finds that, to the extent FIRREA saves the forbearances in this case, any claim of irreparable harm wrought upon the perceived goal of the statute—less risk through heightened capital requirements—is utterly illusory.

In sum, the court finds that the balance of hardships tips decidedly in favor of Sterling. So long as the government agencies are allowed to unilaterally disregard the agreements it entered with Sterling and continually threaten and implement regulatory sanctions in varying degrees, Sterling

will continue to experience harm and injury that is incapable of monetary calculation or measure. When compared to the countervailing risk of harm or prejudice to the government or, more precisely, the public, the result is clear.

### B. Probability of Success

■ Assessing the probability that Sterling will succeed on the merits of this case requires the court to interpret the intricate and sometimes obscure statutory language of FIRREA. Even before that, however, the court must decide whether the capital and accounting forbearances in this case were part and parcel of the negotiated acquisitions and, therefore, contractually binding. Little discussion is needed to show that these agreements were obligatory, both on the FHLBB and the FSLIC and, to an equal extent, on their successor agencies, the OTS and the FDIC.

Unlike the gratuitous forbearance letter that was rejected in *Flagship Federal Savings Bank, et al. v. Wall, et al.,* 748 F.Supp. 742 (S.D.Cal.1990), the agreements in this case were the product of lengthy negotiations in which both sides promised to perform certain duties and obligations and expected valuable benefits in return. The available documents conclusively show that the forbearance letters were intended by all parties to be an essential element of the contract, and there is every indication that Sterling would not have agreed to relieve the government of these failed thrifts had the forbearances not been forthcoming. In exchange and as consideration for receiving certain regulatory concessions, Sterling agreed to perform an onerous task that government regulators appeared unwilling and unable to do; specifically, to resolve the problems caused by three failed thrift institutions. Any argument that these contracts, at least prior to FIRREA, were not binding and enforceable against the FHLBB and the FSLIC, both in terms of Sterling's duty to raise its capital to asset ratio and the government's reciprocal duty to afford Sterling the promised capital and accounting treatment, must be rejected.

The defendants also devote a substantial amount of time and effort arguing that the relevant forbearances did not bargain away Congress' sovereign authority and ability to change existing law. Sterling, however, does not dispute the fact that Congress, if it desired, could abrogate each one of these agreements. Sterling claims simply that, instead of *terminating* the contracts, FIR-REA expressly assured their ongoing existence. On this limited and single remaining issue, this court goes only so far as to agree that FIRREA neither nullified Sterling's agreements nor authorized the OTS to turn its regulatory back on their continued validity.

Relying on § 401, Sterling contends that FIRREA expressly saves its negotiated forbearances in this case. Section 401 provides in pertinent part:

**(a) In general.** (1) FSLIC. Effective on the date of the enactment of this Act, the Federal Savings and Loan Insurance Corporation established under section 402 of the National Housing Act [12 USCS § 1725] is abolished. (2) FHLBB. Effective at the end of the 60–day period beginning on the date of the enactment of this Act, the Federal Home Loan Bank Board and the position of Chairman of the Federal Home Loan Bank Board are abolished.

\* \* \* \* \* \*

**(f) Savings provisions relating to FSLIC.** (1) Existing rights, duties, and obligations not affected. Subsection (a) shall not affect the validity of any *right, duty, or obligation* of the United States, the Federal Savings and Loan Insurance Corporation, or any other person, which—

(A) arises under or pursuant to any section of title IV of the National Housing Act [12 USCS §§ 1724 et seq.]; and

(B) existed on the day before the date of the enactment of this Act. . . .

**(g) Savings provisions relating to FHLBB.** (1) Existing rights, duties, and obligations not affected. Subsection (a) shall not affect the validity of any *right, duty, or obligation* of the United States,

the Federal Home Loan Bank Board, or any other person, which—

(A) arises under or pursuant to the Federal Home Loan Bank Act [12 USCS §§ 1421 et seq.], the Home Owners' Loan Act of 1933 [12 USCS §§ 1461 et seq., generally; for full classification, consult USCS Tables volumes], or any other provision of law applicable with respect to such Board (other than title IV of the National Housing Act [12 USCS §§ 1724 et seq.]); and

(B) existed on the day before the date of the enactment of this Act....

FIRREA § 401, 103 Stat. 354–57 (emphasis added).

As stated above, the forbearances in this case were part of the overall contract entered into between Sterling and the predecessor agencies that resulted in Sterling's acquisition of the troubled thrifts. As such, the parties to those agreements were vested with certain "rights, duties, and obligations" that, under the above statute, survived the abolition of the FHLBB and the FSLIC.

Although they disagree, the defendants are willing to accept a determination that § 401 preserved the negotiated agreements, notwithstanding the discontinuation of the previous regulatory agencies. *See* Ct.Rec. 57, at 6. They argue, however, that any life left in the agreements was extinguished in § 301 wherein Congress prescribed new, uniformly applicable capital requirements for *all* thrift institutions.[2] Specifically, the defendants rely on the fol-

lowing provision, placing monumental emphasis on the word "all":

**Minimum capital requirements.** (1) In general. Consistent with the purposes of section 908 of the International Lending Supervision Act of 1983 [12 USCS § 3907] and the capital requirements established pursuant to such section by the appropriate Federal banking agencies (as defined in section 903(1) of such Act [12 USCS § 3902(1)]), the Director shall require *all* savings associations to achieve and maintain adequate capital by—

(A) establishing minimum levels of capital for savings associations; and

(B) using such other methods as the Director determines to be appropriate.

12 U.S.C. § 1464(s) (emphasis added).

The defendants' entire argument hinges on one key concept: under FIRREA, the Director has no choice but to require that all thrifts, unless expressly excepted by statute, conform their capital structures to the standards set forth in § 301(t).[3] From this they *infer* that, because Sterling's continued operation under the agreements does not technically comply with the promulgated standards, and because the Director has no authority to make exceptions to the rule, Congress implicitly abrogated the contracts. This logic, however, breaks down if the Director indeed does have discretion to make an exception in an appropriate case. If the Director retains some limited volition, the defendants' inference would fail and the contractual arrange-

---

2. The defendants also offer their standard argument that § 401 only saved the contracts from being terminated solely by reason of the abolition of the predecessor agencies while, here, any contractual abrogation was the product of congressional or agency action. As with Judge Panner in *Far West Federal Bank, et al. v. Director, Office of Thrift Supervision, et al.*, 738 F.Supp. 1559 (D.Ore.1990), this court rejects the argument. These agreements expressly survived the abolition of the FHLBB and the FSLIC and only additional action by Congress can cause their demise. Without such authority, the OTS certainly has no basis to override the express mandate of § 401.

3. Section 301(t) provides in part:

Capital standards. (1) In general. (A) Requirement for standards to be prescribed.

The Director shall, by regulation, prescribe and maintain uniformly applicable capital standards for savings associations. Those standards shall include—

(i) a leverage limit;

(ii) a tangible capital requirement; and

(iii) a risk-based capital requirement.

12 U.S.C. § 1464(t)(1)(A). The statute goes on to set a base amount for each of the three categories and provides that a savings institution is not in compliance with capital standards *"for purposes of this subsection"* unless all three categories are met. *Id.* § 1464(t)(1)(B) (emphasis added). The underlined section suggests to this court that some capital standards, perhaps "minimum" levels, *see id.* § 1464(s)(2), might be established elsewhere in the statute.

ments in this instance, unlike the gratuitous forbearances at issue in *Flagship*, would bind the Director and require him to exercise his discretion in favor of Sterling. Thus, the key would appear to be whether § 301(s)(2) affords the Director such authority.

In general § 301(s) sets forth the role of "minimum" capital standards in FIRREA's overall structure and requires the Director to establish such standards for all thrifts. *See* 12 U.S.C. § 1464(s)(1). Section 301(s)(2) then provides:

> Minimum capital levels may be determined by Director case-by-case. The Director may, *consistent with subsection (t)*, establish the minimum level of capital for a savings association *at such amount or at such ratio of capital-to-assets as the Director determines to be necessary or appropriate* for such association in light of the particular circumstances of the association.

12 U.S.C. § 1464(s)(2) (emphasis added).

Sterling, of course, focuses on language that permits the Director to establish minimum capital levels "at such amount" as is considered necessary under a given set of circumstances. The defendants, however, seizing the "consistent with subsection (t)" language, interpret the provision as only giving the Director authority to set minimum levels that equal or exceed those promulgated in § 301(t). In essence, they maintain that subsection (t) establishes an "absolute" minimum level of capitalization. Thus, they imply, the Director lacks the needed discretion to honor the contracts.

Although the defendants present an appealing argument, the court rejects it for several reasons. First, the word "consistent" in this instance can convey a multitude of ideas, many of which are as viable or more viable than the interpretation offered by the OTS and the FDIC.[4] For instance, it may be that Congress intended that the minimum levels should follow the same general structure as set out in subsection (t) or that the levels set would not be inordinately disproportionate to the base standards. This certainly would give the Director substantial leeway to set limits "in such amounts or at such ratio" as deemed appropriate. If Congress wished to ensure that the capital levels set by the Director were equal to or above those in subsection (t), it easily could have said as much directly.

Second, having found that Congress expressly preserved Sterling's contracts under § 401, at least from abrogation based on the discontinuation of the predecessor agencies, it would appear to be somewhat incongruous for Congress immediately to turn around and nullify those same agreements. That Congress would accomplish such a result by nothing more than mere innuendo, its intent disguised by a questionable inference, makes it all the more doubtful.

Finally, the court is persuaded further by the lack of specificity in the statute with regard to contracts of this nature.[5] Statutory authorization to effect a taking, which of course would be the case here, must be specific either in terms of an express remedy for the act or explicit permission to perform the act. *See, e.g., Outboard Marine Corp. v. Thomas*, 773 F.2d 883, 891 (7th Cir.1985), *vacated on other grounds*, 479 U.S. 1002, 107 S.Ct. 638, 93 L.Ed.2d 695 (1986); *Government of Guam v. Moylan*, 407 F.2d 567, 568–69 (9th Cir.1969); *Polson*

---

4. The defendants no doubt will object to this ruling as being contrary to the settled axiom that an agency's interpretation of a particular statute, if reasonable, is entitled to deference. *See Chevron U.S.A. v. Natural Resources Defense, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Although the court recognizes this principle, as it must, deference is unwarranted here because the court finds that the defendants' interpretation of FIRREA, as a whole, is substantially unreasonable.

5. Of course, the defendants point to the savings clause in Title III in which Congress specifically saved certain forbearances from being swallowed up by FIRREA. *See* FIRREA § 302, 103 Stat. 343. The court is satisfied at this point that § 302 only excepts certain unilateral, gratuitous forbearances that otherwise would not survive FIRREA's new capital requirements. Unlike the obligatory agreements at issue here, as to which a specific savings clause was already present, *see* FIRREA § 401, the gratuitous forbearances had to be separately preserved.

*Logging Co. v. United States*, 160 F.2d 712, 714 (9th Cir.1947). In this case there is neither. In fact, not only is it far from clear that Congress intended to effect a taking, but the language suggests that Congress intended quite the opposite. Without some sort of clear statutory mandate, the court will not lightly infer that Congress has undertaken to abrogate the contractual rights of private citizens.[6]

### Conclusion

The court is acutely aware of the formidable task facing Congress and federal regulators in nursing a failed and wounded savings and loan industry back to health. Hard times do indeed call for stern measures. But those measures should not be wholly devoid of all equity, decency, and compliance by the government with its prior agreements. In a somewhat analogous context, Justice Louis Brandeis once wrote:

> Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy....

*Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). Such advice and counsel is equally germane in the realm of contract. A fitting corollary is the comment of Justice Hugo Black, quoted by the court at oral argument, that "[g]reat nations, like great men, should keep their word." *Federal Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 142, 80 S.Ct. 543, 567, 4 L.Ed.2d 584 (1959) (Black, J., dissenting). These principles are both sound and persuasive, and must guide this court as it performs the task of deciding between two diametrically conflicting interpretations of the same statute.

As this court reads FIRREA, Congress has honored the promises made to Sterling. It is the regulators who, in their zeal for nonnegotiable uniformity, have discovered a contrary intent that this court finds is not clear from the statutory language. But even assuming the defendants are correct in their assertion that Congress harbored an intent to abrogate binding and enforceable contracts, as it has power to do, the court must insist that it be evidenced in a forthright and unmistakable manner. Absent a clear mandate to the contrary, the court will require the defendants to honor the contracts entered into between Sterling and the predecessor agencies.

IT IS HEREBY ORDERED:

1. Sterling's Motion for Preliminary Injunction (Ct.Rec. 16) is HEREBY GRANTED. The defendants are HEREBY ENJOINED AND RESTRAINED from:

  a. imposing or enforcing any regulatory restriction or taking other regulatory action against Sterling that is inconsistent with the provisions of the November 1985, April 1988, and December 1988 supervisory acquisition agreements between Sterling and the FHLBB and the FSLIC;

  b. enforcing or attempting to enforce the operating restrictions imposed by the January 26, 1990, March 9, 1990, and the May 11, 1990, letters from the Office of Thrift Supervision to Sterling that treat Sterling as a troubled thrift;

---

**6.** Sterling argues that § 501 of FIRREA, which outlines the operation and duties of the RTC, also supports its reading of the statute. Although the court does not rely on this particular portion of FIRREA in reaching the above decision, it is worth noting that, contrary to the fact-specific findings in *Flagship* and *Far West*, § 501 might have relevance here. Section 501 requires the RTC to review "existing" agreements entered into by the FSLIC prior to the enactment of FIRREA. *See* FIRREA § 501(b)(11)(B). That the RTC apparently is reviewing Sterling's agreements from the Tri-Cities' acquisition, *see* Ct.Rec. 50, and considers these contracts to fall within the category labeled "existing," seems to indicate that one regulatory agency does not completely share the OTS's interpretation of FIRREA.

c. placing Sterling in a receivership or conservatorship; and

d. interfering with Sterling's proposed public stock offering contemplated in the 1988 Central Evergreen acquisition agreement.

2. OTS and FDIC's Motion to Dismiss (Ct.Rec. 41) is HEREBY DENIED.

3. FHLB's Motion for Order of Dismissal (Ct.Rec. 37) is HEREBY DENIED AS MOOT, counsel having informed the court that the parties have reached agreement as to the stipulated dismissal of FHLB as a defendant in this action.

4. OTS and FDIC's Motion for Leave to Cite Unpublished Decisions (Ct.Rec. 31) is HEREBY GRANTED.

IT IS SO ORDERED. The Clerk is hereby directed to enter this Order and furnish copies to counsel.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART MOTION TO RECONSIDER

BEFORE THE COURT are the defendants' Motion for Reconsideration (Ct.Rec. 63) and Motion for Expedited Hearing (Ct. Rec. 65), heard without oral argument on August 31, 1990. Having reviewed the record, and being fully advised in this matter, IT IS HEREBY ORDERED that the Motion for Expedited Hearing is GRANTED; the Motion for Reconsideration is GRANTED IN PART AND DENIED IN PART.

### Background

A detailed history of the facts leading up to this case is set forth in the court's Memorandum Opinion and Order Granting Preliminary Injunction (Ct.Rec. 61) and will not be repeated here. For present purposes, it is sufficient to note that on July 3, 1990, this court issued a preliminary injunction prohibiting the defendants, the present federal agencies charged with overseeing the thrift industry, from taking any adverse action against Sterling that would be inconsistent with the provisions of certain acquisition contracts entered into between Ster-

ling and the previous regulatory agencies. The defendants now ask the court to reconsider both the scope of the injunction and several substantive aspects of the court's ruling.

### Discussion

Motions for reconsideration serve a limited function. " '[T]he major grounds that justify reconsideration involve an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.' " *Pyramid Lake Paiute Tribe v. Hodel*, 882 F.2d 364, 369 n. 5 (9th Cir.1989) (quoting 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4478, at 790); *see Frederick S. Wyle P.C. v. Texaco, Inc.*, 764 F.2d 604, 609 (9th Cir. 1985); *see also Keene Corp. v. International Fidelity Ins. Co.*, 561 F.Supp. 656, 665 (N.D.Ill.1982) (reconsideration available "to correct manifest errors of law or fact or to present newly discovered evidence"). Such motions are not the proper vehicle for offering evidence or theories of law that were available to the party at the time of the initial ruling. *Fay Corp. v. Bat Holdings I, Inc.*, 651 F.Supp. 307, 309 (W.D. Wash.1987); *see Keene Corp.*, 561 F.Supp. at 665–66.

In the instant case, the defendants have not alleged, nor could they, that there has been an intervening change of controlling law. Likewise, they have not offered newly discovered evidence that would justify this court taking a second look at the issue in question. Thus, the only remaining question is whether the court should alter its prior ruling in order to "correct a clear error or prevent manifest injustice." *Pyramid Lake*, 882 F.2d at 369 n. 5.

In terms of the substantive aspects of the court's ruling, the defendants reiterate their argument with respect to section 401(h) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). That section provides:

Subject to section 402 [this note], all orders, resolutions, determinations, and regulations, which—

(1) have been issued, made, prescribed, or allowed to become effective by the Federal Savings and Loan Insurance Corporation or the Federal Home Loan Bank Board ... or by a court of competent jurisdiction, in the performance of functions which are transferred by this Act; and

(2) are in effect on the date this Act takes effect, shall continue in effect according to the terms of such orders, resolutions, determinations, and regulations and shall be enforceable by or against the Director of the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, the Federal Housing Finance Board, or the Resolution Trust Corporation, as the case may be, until modified, terminated, set aside, or superseded in accordance with applicable law by the Director of the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, the Federal Housing Finance Board, or the Resolution Trust Corporation, as the case may be, by any court of competent jurisdiction, or by operation of law.

FIRREA § 401(h). The defendants argue that, by reason of the above statutory provision, the negotiated capital forbearances and other accounting concessions obtained by Sterling were superseded when the OTS issued its regulations implementing FIRREA's capital requirements. The defendants also offer § 401(h) as a rebuttal to what they call the court's "conclusion" that "only additional action by Congress, as opposed to FIRREA itself, can supersede [the plaintiff's] forbearance."

■ The defendants, however, have failed to grasp the true import of this court's July 3, 1990 opinion at footnote 2. The language used simply reflects the finding that FIRREA does not eviscerate the contractual forbearances at issue in this case. Certainly, Congress could have included clear and unmistakable language in FIRREA that would have caused the abrogation of these agreements. The court has found, however, that the requisite language is absent. Thus, at this point, only additional action by Congress can cause their demise or give the OTS authority to

effect such a result. In footnote 2, this court meant nothing more and intended nothing less.

■ The court also is satisfied that § 401(h) does not mandate a different ruling than that recited by the court previously. The negotiated forbearances in this case, which create "rights, duties and obligations," fall within the savings provision codified at § 401(g). Section 401(h), on the other hand, appears to pertain only to "resolutions" or "determinations" that are gratuitous in nature. More importantly, § 401(h) does not, in and of itself, grant the director of the OTS power to do anything. It merely states that the various determinations of the prior agencies remain in effect until superseded by "operation of law" or by the director "in accordance with applicable law." Thus, even assuming that the acquisition agreements constitute "determinations" under the statute, the director may disregard them only if permitted elsewhere in FIRREA. As previously stated, the court is unable to find such a mandate or authorization anywhere in the statute.

The defendants also assign error to this court's finding that FIRREA, at § 301(s), affords the director a limited amount of discretion to except some thrifts from FIRREA's capitalization requirements, thereby destroying the basis for the defendant's inference that the statute implicitly abrogates the negotiated forbearances. They contend that the court's ruling completely nullifies § 301(t)(8) wherein Congress permits the director to make limited exceptions to the capital requirements found in § 301(t). Under § 301(t)(8), no exceptions are effective after January 1, 1991.

The court finds it somewhat ironic that the defendants, in an attempt to establish a clear and unmistakable statutory basis for finding a congressional intent to abrogate these otherwise enforceable contracts, would cite the court to additional provisions that only have an obscuring effect and tend to illustrate the facial inconsistencies that are said to plague the statute. None-

theless, the court is satisfied that the two provisions are harmonious and, although each serves a unique function, one complements the other.

This court notes, once again, that § 301(s) pertains to "minimum" levels of capitalization and allows the director to determine those levels on a "case-by-case" basis. That § 301(t)(8) would limit that discretion in certain circumstances seems entirely logical. Obviously, given the known goals of the statute, Congress wanted to prevent federal regulators from repeating past mistakes through the practice of granting forbearances to any and all thrifts in a gratuitous fashion. This appears to be the function of § 301(t)(8).[1]

That fact alone, however, says little about the continued validity of the contractual forbearances at issue here. As to these matters, § 301(s) is sufficiently permissive to dismiss the inference urged by the defendants. Thus viewed, the court's reading of § 301(s) does not nullify § 301(t)(8). The two provisions, though related in a sense and, therefore, superficially conflicting, can be harmonized as interpreted.[2] At the very least, the court's prior ruling was not "clearly erroneous."

Finally, the defendants ask the court to reconsider the scope of the injunction. First, they seek a ruling that the regulatory treatment of goodwill created in the Central Evergreen acquisition is not part of the contract previously negotiated between Sterling and the federal agencies. They base this contention on the fact that the regulatory forbearance was not the subject of an express contractual provision.

At this point, this court is unwilling to hold that the supervisory goodwill and other regulatory treatment afforded Sterling was not part and parcel of the overall contract. Clearly, these items were used as "carrots" to induce Sterling to close the transaction, and Sterling no doubt relied on these assurances. Such reliance can be the basis for an implied-in-fact contract. *See Winstar Corp. v. United States*, 21 Cl.Ct. 112 (1990). Thus, any modification of the court's decision based on the Central Evergreen acquisition is premature.

■ The defendants' second request is more meritorious. They ask that the court narrow its injunction insofar as it prohibits federal regulators from placing Sterling in a conservatorship or receivership. After further study, the court agrees that, given the basis for the court's ruling, the injunction is overly broad. The Government need only be enjoined from appointing a receiver or conservator to the extent that such action would not be appropriate when the contracts are honored and given effect. Thus, paragraph "c" of the court's Injunction, *see* Ct.Rec. 61, at 28, is HEREBY STRICKEN. The court orders and intends that paragraph "a", *see id.* at 27, of the injunction prevents any attempt by the defendants to appoint a receiver or conservator based on a reason that, either directly or indirectly, is inconsistent with the relevant contracts. Thus, to this limited extent, the motion for reconsideration is GRANTED. The motion is DENIED in all other respects.

IT IS SO ORDERED.

---

1. Indeed, after January 1, 1991, it appears that the OTS is without authority to grant any new forbearances to the capitalization levels set in § 301(t). But that does not mean that the OTS is without authority under § 301(s) to make the occasional extraordinary exception in order to honor past contractual obligations. Section 301(s) appears to offer a very limited exception to the otherwise sweeping general rule set forth in § 301(t).

2. The court reminds the defendants that the major reason for the prior decision was the lack of any language showing a congressional intent to abrogate the contracts in question. The defendants' argument here is less than unconvincing in this regard. Arguing that the Director has temporary discretion to establish that he has no discretion does little to further their attenuated inference.