SECURITY SAVINGS AND LOAN ASSO-CIATION, Bailey Mortgage Company and Security Trust Federal Savings and Loan Association, Plaintiffs,

v.

DIRECTOR, OFFICE OF THRIFT SUPERVISION, in his official capacity and as successor in interest to Federal Home Loan Bank Board, and Federal Deposit Insurance Corporation, in its own capacity and as successor in interest to Federal Savings and Loan Insurance Corporation, Federal Savings and Loan Insurance Corporation, Federal Home Loan Bank Board, Defendants.

Civ. A. No. J90–0486(L).

United States District Court, S.D. Mississippi, Jackson Division.

Feb. 21, 1991.

**1278**

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This cause is before the court on the complaint of plaintiffs Security Savings and Loan Association (Security Savings), Bailey Mortgage Company (Bailey) and Security Trust Federal Savings and Loan Association (Security Trust) seeking declaratory and injunctive relief. After an October 5, 1990 hearing, this court, by memorandum opinion and order dated October 16, 1990, denied in part and granted in part plaintiffs' request for a temporary restraining order. Thereafter, defendants Director of the Office of Thrift Supervision (OTS), Federal Deposit Insurance Corporation (FDIC), Federal Home Loan Bank Board (FHLBB) and Federal Savings and Loan Insurance Corporation (FSLIC) moved to dismiss plaintiffs' complaint, asserting primarily that the government enjoys sovereign immunity as to plaintiffs' claims and that this court lacks subject matter jurisdiction over plaintiffs' complaint. A subsequent hearing was conducted November 20 and 21, 1990 following which the parties were permitted an opportunity to fully brief the issues raised by defendants' motion to dismiss and present their positions regarding the merit of plaintiffs' claims. The court now finds and concludes, based on the testimony adduced and exhibits introduced in evidence, and having considered the argument of counsel, that defendants' motion to dismiss should be denied and plaintiffs are entitled to the injunctive and declaratory relief sought.

In this action, plaintiffs assert that they are entitled to declaratory and injunctive relief precluding the OTS from disregarding agreements entered by the parties in connection with the 1984 merger of Security Savings, a state-chartered federally insured savings and loan association, with New North Mississippi Federal Savings and Loan Association, a failing thrift which had been placed in receivership by FHLBB, and the subsequent acquisition in 1985 by Bailey, of Security Trust Federal Savings and Loan Association. In particular, plaintiffs maintain, *inter alia*, that they are not subject to the new and more stringent capital accounting standards of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 (codified throughout 12 U.S.C.), by virtue of agreements entered with FSLIC and FHLBB in connection with the above referenced transactions. According to plaintiffs, the provisions of those agreements concerning capital accounting treatment were preserved by FIRREA. The events which culminated in the plaintiffs' initiation of the present litigation are set forth in this court's opinion of October 16, 1990 and will not be repeated here. The facts recited therein are incorporated herein, and will be supplemented as needed, in accordance with evidence presented at the hearing on the merits which was held on November 20 and 21, 1990.

Initially, the court observes regarding defendants' motion to dismiss that defendants concede that this court has jurisdiction to resolve the limited statutory claim by plaintiffs that FIRREA preserved prior agreements or contracts entered into by OTS's predecessor agencies relating to capital accounting, that is, the claim by plaintiffs that FIRREA exempts certain thrifts from the new capital requirements.[1] This court need not, therefore, reach the remaining jurisdictional arguments that are the focus of defendants' motion to dismiss. *See Sterling Savings Ass'n v. Ryan,* 751 F.Supp. 871, 875 (E.D.Wash.1990).[2]

### ICC's and Cash Contribution

■ This court previously opined that while the FSLIC and FHLBB had contractually agreed to permit Security Savings to treat the New North ICC, the Security Trust ICC and the cash contribution of the FSLIC in connection with the New North merger as regulatory capital, the agreements between the plaintiffs and those agencies had terminated. The court thus found it unnecessary to decide whether the OTS would similarly be bound by those agreements under the provisions of FIRREA. Upon more thorough consideration of the issue, the court remains of the view that the agreements contractually bound FSLIC and FHLBB to treat the ICC's and cash contribution as regulatory capital.[3] The court is now persuaded, though, that it was incorrect in its assessment of the termination issue, and concludes that the agreements, as they pertain to this accounting treatment, have not terminated. Regarding termination, the New North As-

sistance Agreement provided, in pertinent part, as follows:

> Except as otherwise specifically provided in this Agreement, this Agreement shall terminate three years following the Effective Date or on such other date to which the parties or their successors agree in writing. . . .

The Security Trust Assistance Agreement contained a provision that was identical except that the term was five, rather than three years. Plaintiffs urge that the termination provisions in question were intended to apply only to the indemnity obligations and other continuing financial assistance obligations imposed on FSLIC under the agreements; it was not intended by any of the parties to the transactions that the termination provisions apply to the accounting treatment of the ICC's or the cash contribution by FSLIC. The evidence presented by plaintiffs at the hearing of this cause confirms their position.

All parties agree that there was never any explicit discussion suggesting that the termination clause would apply to the capital treatment of the ICC's or the cash contribution and it was indeed assumed by all parties that the ICC's and the cash contribution would be treated as capital beyond the expiration date of the Assistance Agreements. No one contemplated that the capital treatment would terminate at the end of a three or five year period. Further, there appears to be no dispute that Security Savings would not have been considered financially viable had the treatment of the ICC's as capital not extended

---

**1.** In its prior opinion, the court determined that it had jurisdiction to resolve the claims against OTS pursuant to 12 U.S.C. § 1464(d)(1). The court was in error in that respect since that section addresses only claims by federal savings and loan associations; Security Savings is a state-chartered savings and loan association.

**2.** The court would also note that it believes it may consider plaintiffs' claims by virtue of 28 U.S.C. § 1331 and the Administrative Procedures Act (APA), 5 U.S.C. §§ 702, 704 (1988). *See Hansen Savings Bank v. Office of Thrift Supervision,* 758 F.Supp. 240 (D.N.J.1991).

**3.** Section 3(a)(4) of the Assistance Agreement provided that the New North ICC and cash contribution would constitute regulatory net worth

of Security Savings, stating that "all cash contributions made under § 3(a)(1)(B), and the CORPORATION's purchase of Income Capital Certificates pursuant to § 4 shall be credited to the ACQUIRING ASSOCIATION's net worth account and shall constitute regulatory net worth." FHLBB resolution 84–402 approving the merger confirms that the FHLBB contemplated that Security Savings would treat the New North ICC and cash contribution as a component of its regulatory net worth. The Assistance Agreement and FHLBB Resolution 85–953 relating to the Security Trust acquisition are similar to the New North documents insofar as the ICC is concerned.

beyond the dates of termination of the Assistance Agreements.

H.C. Bailey, Jr., president of Security Savings, testified that Security Savings was granted, at the consummation of the transaction, the right to establish the cash contribution as capital. Security Savings was also granted the right to treat the ICC's as regulatory accounting capital, and as a result of the structure of the instruments, they were to be counted, under generally accepted accounting principles, as permanent capital. He explained that the ICC's represented assets that were acquired by Security Savings, just like cash or any other asset, which did not simply evaporate because the contracts pursuant to which they were issued terminated. He recalled that the parties' discussions concerning termination related only to "indemnifications, guarantees against undisclosed liabilities;" there was never any "discussion, . . . mention, [or] hint" that the capital treatment of the ICC's might terminate at the end of three or five years, or that the termination applied to anything other than the promised indemnification, for if there had been any such suggestion, "it would have stopped the deal cold at that time." Paul J. Salvo, the chief financial officer of Security Savings, also testified that there were never any discussions with any of the regulatory agencies about the termination of the treatment of ICC's as capital. Salvo explained that the treatment of the ICC's as capital "was a vital ingredient in our desire . . . or even our ability to do" the transactions. Had there been any suggestion that the ICC's would no longer be treated as capital after three or five years, Salvo would have recommended that an effort be made to receive cash assistance rather than the ICC's since Security Savings would not have had sufficient capital from the standpoint of future viability as a going concern if it had been contemplated that the ICC's would have terminated while they were still outstanding.

In addition to the testimony of Bailey and Salvo, Kenneth Warren, the managing officer and executive vice-president of Security Savings during the mid–1980's and who was involved in negotiating the New North merger, explained his understanding of the Assistance Agreement provisions relating to capital treatment of ICC's and the cash assistance:

A. That was a one-time credit to our net worth and there was no further consideration as to whether that net worth would be counted as our capital—as part of our permanent capital in the future. That was our understanding. I might also add that was a representation made by the regulatory authorities to me also.

Q. Now would you have been willing to go forward with the New North transaction if you had not received the promise that you would be able to account for the cash and the ICC's as regulatory net worth.

A. There's no way that I could have recommended going forward with this transaction because Security would have failed the capital requirements, your Honor. The regulators would not have allowed us to proceed with this transaction had it not been as part of permanent capital nor would the Commissioner of the State of Mississippi have allowed us to go any further. It was totally inconceivable that when they said it would count as part of our capital it would ever be considered to be taken away from our capital.

Warren stated without equivocation that the termination provisions had no relation whatsoever to the capital treatment of the ICC and had there been any suggestion that the ICC would cease to count as net worth after three years because of the termination provision, he would not have recommended that Security Savings proceed with the transaction.

William Matthews, who was employed with the Problems and Rehabilitations Division (now Mergers and Acquisitions Division) of the office of the FSLIC, was involved on behalf of FSLIC in negotiating the New North transaction. Matthews testified at the hearing that in his review of the viability analysis of the proposed trans-

action, it was assumed that the ICC was still going to be treated as capital after three years; it was assumed that the ICC would be treated as capital for a full seven years, i.e., until repaid, and there were never any discussions about a termination date with respect to the capital treatment of the ICC. Similarly, Tom Mack, one of the persons responsible for making sure that the resulting association was financially viable, testified by deposition that

> if the ICC's or the use of ICC's as capital expired in three years and the—if the operation of the successor was not able to withstand that treatment of the ICC's as far as not being counted as capital, there's no way I would have recommended it for approval, this or any other transaction.

And William M. Yeager, Commissioner of Savings of the State of Mississippi, responded that he would not have approved the New North transaction if the treatment of the ICC would have terminated after three years.

Based on the foregoing, it is clear that all of the parties to the negotiations in both transactions intended that the ICC's would be treated as capital for so long as they were outstanding. The defendants offered no proof to refute plaintiffs' assertion that the termination provision was discussed only in connection with the indemnity provisions of the Assistance Agreements and was not intended to relate to the capital treatment of the ICC's or cash contribution. Moreover, it is uncontradicted that the regulatory authorities would not have approved the transaction if it had been contemplated that the ICC's would convert from equity to debt at the end of three or five years, since that would have rendered the capital structure of Security Savings unsound.[4]

Though not clearly so limited by their own terms, it is manifest that the parties neither intended nor anticipated that the termination provisions of the Assistance Agreements would apply to Section 3(a)(4) of the New North agreement or the corresponding portion of the Security Trust agreement pertaining to the accounting treatment of the ICC's, and the parties' agreement should be so construed.

*Supervisory Goodwill*

█ This court previously determined that while it was implicit that supervisory goodwill generated as a result of the transactions at issue would be treated as an asset to be amortized over a period of time, the treatment of supervisory goodwill as capital was merely then-existing regulatory policy which was not prescribed by the contract itself. The court, therefore, concluded that under FIRREA, OTS could properly require the exclusion of such goodwill from Security Savings' capital. However, just as the court has determined that its prior conclusion regarding termination of the agreed accounting treatment of the ICC's and cash contribution was in error, the court must now, after having more thoroughly examined the documents and events involved in the transactions and having considered the testimony adduced at the hearing, conclude that plaintiffs were contractually entitled to treat supervisory goodwill generated by the New North transaction as an asset.

In reaching its prior conclusion, the court was persuaded that the treatment of goodwill as an asset was not a contractual obligation of FSLIC or FHLBB because there was no reference to goodwill in the Assistance Agreement. It is now clear, based on the testimony presented at the hearing, that goodwill was not included in the Assistance Agreement because goodwill is not "assistance." As H.C. Bailey explained, goodwill was not something that Security Savings received from FSLIC and FHLBB in connection with the transaction, but rather was part of the accounting method by which the transaction was conducted.

---

**4.** It is worth noting that the language of the termination provisions in the agreements actually executed is virtually identical to language contained in a prototype draft agreement provided by FSLIC and FHLBB in conjunction with the bid instructions and information package. However, the prototype draft contains no provisions for ICC's. Thus, it is reasonable to conclude that the termination clause, as originally drafted, was not intended to have any application to the provisions subsequently included in the agreements relating to the ICC's.

Bill Matthews and Lee Lassiter, who was a staff attorney for FHLBB during the New North transaction, also testified that goodwill would not have been included in the Assistance Agreement because it was not assistance. According to Matthews, where the purchase method of accounting was appropriate, which was typical for supervisory acquisitions, goodwill was simply included as an asset. The Assistance Agreement was intended to describe the assistance granted by FSLIC in the transactions, and was not intended to and did not purport to encompass the entirety of the parties' agreement. Thus, the absence of any reference to goodwill in the Assistance Agreement does not support the defendants' argument that goodwill was not part of the transaction. Indeed, based on the documentary evidence of record, it is clear that a fundamental premise of the New North merger was the inclusion of goodwill as an asset on Security Savings' books.

The bid solicitation package, containing bid proposal information and instructions, which was prepared by the Merger and Acquisitions Office of the FSLIC and which was provided to Security Savings as a potential acquirer of New North, contemplated utilization of the purchase method of accounting and requested that Security Savings stipulate the manner in which any goodwill that was created as a result of using the purchase method of accounting would be amortized and treated by the acquiring institution:

> If the acquisition would involve purchase or push-down accounting, a statement justifying the accounting treatment, the estimated amount of goodwill to be created, and the amortization periods should be presented in the bid. For purposes of regulatory accounting, Attachment 1 discusses the accounting treatment the Bank Board will consider in an FSLIC assisted acquisition.

Attachment 1 was a February 3, 1983 FHLBB memo, the subject of which was the application of purchase accounting to assisted mergers. The memo stated,

> We recognize that it may be advantageous to the FSLIC for the Board to authorize the use of accounting princi-

ples for assisted mergers of institutions which depart from generally accepted accounting principles. Accordingly, our office will not object to the establishment of regulatory accounting principles in connection with the application of the purchase method in assisted mergers which contains the following departures from GAAP.

.    .    .    .    .

> 3. The value of intangible assets which are quantified through the application of the purchase method can be treated in any of the following ways:
> a. Values may be assigned to the identifiable intangibles and amortized over the life of such intangibles, with the unidentifiable portion (goodwill) amortized over 40 years by the straight line method.
> b. The entire value of intangible assets may be amortized over 40 years by any standard accelerated method (i.e., Sum of Years Digits); or
> c. The entire value of intangible assets may be amortized over a period not in excess of 35 years by the straight line method.
> *This treatment of the value of intangible assets may be used regardless of any existing or future interpretations or modifications of GAAP in this area.* (emphasis supplied).

After Security Savings had submitted a bid proposal, a "Viability Analysis of New North FS & LA of Oxford, Miss. ...," prepared by FHLBB recited under the heading "Relevant Assumptions," that "Purchase accounting is applied to the assets of New North. The mortgage discount rate is 14.58%, the other loans discount rate is 14.41%. Goodwill is amortized over 40 years." Additionally, the "S" Memorandum, or supervisory memorandum, which was prepared by the FHLBB Office of Examinations and Supervision and which was provided to FHLBB explaining the transaction, recited that "Security proposes to acquire New North Mississippi ... through an assisted conversion merger using the purchase method of accounting." It was recommended that FHLBB approve

the conversion-merger application, and under the heading "Purchase Accounting," it was recited that "OES believes that the proposed use of purchase accounting by Security is appropriate." Finally, FHLBB resolution 84–402 provided for the inclusion of goodwill in Security Savings' regulatory net worth by requiring Security Savings' accountants to "(a) specifically describe, as of the effective date of the merger, any intangible assets on Security's books as a result of the merger, and (b) substantiate the reasonableness of the amounts attributed to such intangible assets, including goodwill, and the reasonableness of the related amortization periods and methods."

In addition to the documentary evidence which demonstrates quite clearly that the inclusion of goodwill was a basic premise of the transaction, the testimony confirms the importance of goodwill to the parties' agreement. Bill Matthews testified that "the deal wouldn't [have] worke[d] unless you included the goodwill." He stated that "[i]f you had not allowed the goodwill to count as an asset and if it were deducted against capital, it would not have been a viable transaction." Tom Mack also indicated that had there been the potential that goodwill would have been subsequently removed from Security Savings' books, then the transaction should probably not have been approved at all. Bailey and Warren were adamant in their testimony that Security Savings would never have proceeded with the New North transaction without the assurance that goodwill would be treated as an asset. Bailey described the establishment and inclusion of goodwill as an asset as "absolutely fundamental" to Security Savings' entering the transaction. He explained:

Security would have been insolvent on the day of the transaction without the goodwill being established and being recognized from the auditors and the regulators as an asset. It would have been

insolvent that day. So I can tell you I would not have been willing to go into that transaction.[5]

Based on the evidence presented, the court concludes that all parties considered the treatment of goodwill as an express term of the transaction which would endure "regardless of any future interpretations or modifications of GAAP in this area." *See Sterling Sav. Ass'n v. Ryan*, 751 F.Supp. 871 (E.D.Wash.1990) (observing that forbearance letters were intended by all parties to be essential element of contract and that there was every indication that Sterling would not have agreed· to relieve government of these failed thrifts had the forbearances not been forthcoming). Even if not an express undertaking of the government, it was certainly implicit that such treatment would be accorded goodwill. In a virtually identical case, the court determined that there existed an enforceable implied in fact agreement by the government that goodwill would be amortized over an agreed period regardless of changes in GAAP or regulatory policy. In *Winstar Corp. v. United States*, 21 Cl.Ct. 112 (1990), the court, having considered evidence of the parties' proposals, the government's analysis of the transaction and the conduct of the parties, concluded as follows:

The documents discussed above are representative of the evidence that leads this court to the firm conclusion that the government expressly intended to contract for the particular treatment of goodwill at issue in this case, notwithstanding changes in GAAP or in the statutory scheme. There is no support for the defendant's argument that these statements merely were representations of then existing regulatory policy. Rather, they illustrate the reality that the promise of continued treatment of goodwill as a capital asset that could be amortized over thirty five years was a negoti-

---

**5.** The court would also note that approval of the transaction by the State Commissioner of Savings was based on the inclusion of goodwill as an asset. William Yeager testified that he could not have approved the transaction had he known that the OTS would later take the posi-

tion that Security Savings could not count the goodwill since that would have placed Security in an impaired condition which would have precipitated actions to place Security in receivership.

ated and critical term of this particular transaction. It was critical because it was clear that without it no purchaser would have engaged in this transaction. The observations and conclusions by the *Winstar* court are equally applicable here.

### Effect of FIRREA

■ Having determined that FHLBB and FSLIC were contractually obligated to permit Security Savings to treat the ICC's and cash contribution as capital and the goodwill as a capital asset, the question thus becomes whether those obligations survive FIRREA and are thus binding on OTS. In this regard, section 401 of FIRREA provides in pertinent part:

(a) In general. (1) FSLIC. Effective on the date of the enactment of this Act, the Federal Savings and Loan Insurance Corporation ... is abolished. (2) FHLBB. Effective at the end of the 60-day period beginning on the date of the enactment of this Act, the Federal Home Loan Bank Board and the position of Chairman of the Federal Home Loan Bank Board are abolished.

.    .    .    .    .

(f) Savings provisions relating to FSLIC. (1) Existing rights, duties, and obligations not affected. Subsection (a) shall not affect the validity of any right, duty, or obligation of the United States, the Federal Savings and Loan Insurance Corporation, or any other person which—

(A) arise under or pursuant to any section of title IV of the National Housing Act ...; and

(B) existed on the day before the date of the enactment of this Act.

(g) Savings provision relating to FHLBB. (1) Existing rights, duties, and obligations not affected. Subsection (a) shall not affect the validity of any right, duty, or obligation of the United States, the Federal Home Loan Bank Board, or any other person, which—

(A) arises under or pursuant to the Federal Home Loan Bank Act ..., the Home Owners' Loan Act of 1933 ..., or any other provision of law applicable with respect to such Board ...; and

(B) existed on the day before the date of the enactment of this Act....

FIRREA § 401, 103 Stat. 354–57. Most courts which have confronted the issue now before the court have held that FIRREA does not abrogate, but rather preserves, in section 401(g), assistance agreements which were formed in supervisory mergers. See *Hansen Savings Bank v. Office of Thrift Supervision*, 758 F.Supp. 240, 245–46, (D.N.J.1991); *Far West Fed. Bank v. Director, Office of Thrift Supervision*, 738 F.Supp. 1559, 1563 (D.Ore.1990) (if FIRREA abrogates all existing contracts that bound United States before its enactment, section 401(g) would be surplusage, utterly without purpose); *Franklin Fed. Sav. Bank v. Director, Office of Thrift Supervision*, No. 2–90–166, slip op. at 3, 1990 WL 123145 (E.D.Tenn. July 16, 1990) (FIRREA did not abrogate grant of forbearance and forbearance was thus binding on successors in interest to FSLIC and FHLBB); *Security Fed. Sav. Bank v. Director, Office of Thrift Supervision*, 747 F.Supp. 656, 659 (N.D.Fla.1990) (by virtue of preexisting contract, plaintiff savings association had a "right" and FHLBB an "obligation" within meaning of section 401(g) which OTS was not authorized to unilaterally abrogate); *Guaranty Fin. Serv., Inc. v. Director, Office of Thrift Supervision*, 742 F.Supp. 1159, 1162 (M.D. Ga.1990) (assuming conversion agreement was a contract, court held it clearly created rights, duties and obligations and therefore fell under section 401(g) of FIRREA); *Sterling Sav. Ass'n v. Ryan*, 751 F.Supp. 871, 880 (E.D.Wash.1990) (FIRREA neither nullified preexisting agreements nor authorized OTS to turn its regulatory back on their continued validity). *But see Flagship Fed. Sav. Bank v. Wall, Director*, No. 90–0079–GT (S.D.Cal. Feb. 14, 1990); *El Paso Sav. Ass'n v. Director, Office of Thrift Supervision*, No. EP–89–CA–426–H (W.D.Tex. Jan. 9, 1990). This court is in agreement with the conclusions reached by those courts which have held that section 401(g) preserved and made binding upon OTS preexisting agreements of FSLIC and FHLBB to which those agencies were bound. The agreements entered between

the parties relative to the New North and Security Trust transactions are just such agreements. They created rights, duties and obligations which survived the abolition of the FHLBB and FSLIC, and are thus binding on defendants. As the court stated in *Sterling,*

> [E]ven assuming the defendants are correct in their assertion that Congress harbored an intent to abrogate binding and enforceable contracts, as it has power to do, the court must insist that it be evidenced in a forthright and unmistakable manner. Absent a clear mandate to the contrary, the court will require the defendants to honor the contracts entered into between [plaintiff] and the predecessor agencies.

*Sterling,* 751 F.Supp. at 881.

### Consolidation

The court remains of the opinion that plaintiffs are exempted from consolidation and thus incorporates herein its prior opinion insofar as it pertains to the issue of consolidation.

### Conclusion

Based on the foregoing, it is ordered that plaintiffs' prayer to permanently enjoin defendants from excluding supervisory goodwill, the New North ICC and cash contribution, and the Security Trust ICC from capital, and from requiring consolidation of all depository subsidiaries is granted.

A separate judgment shall be entered in accordance with Federal Rule of Civil Procedure 58.

ORDERED.