**FEDERAL DEPOSIT INSURANCE CORPORATION, as Successor in Interest to Security Savings, Bailey Mortgage Company, Security Federal Savings and Loan Association; and, H.C. Bailey, Jr., et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Nos. 92–577C, 92–817C.**

United States Court of Federal Claims.

May 8, 2000.

Mary C. Gill, Alston & Bird LLP, Atlanta, Georgia, with whom was Alan W. Perry, Forman, Perry, Watkins, Krutz & Tardy, PLLC, Jackson, Mississippi, for plaintiffs H.C. Bailey, Jr., et al.

Richard M. Schwartz, with whom was John M. Dorsey III, Federal Deposit Insurance Corporation, Washington, D.C., for plaintiff Federal Deposit Insurance Corporation.

Robert Steinbuch, with whom were James L. Anderson, Ming–Yuen Meyer–Fong, Thomas P. Reilly, William F. Ryan, Jeanne E. Davidson, Deputy Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, and David W. Ogden, Acting Assistant Attorney General, United States

Department of Justice, Washington, D.C., for defendant.

## OPINION

SMITH, Chief Judge.

This extensively chronicled *Winstar*-related case is before the court on defendant's motions to dismiss and the parties' cross-motions for summary judgment on breach of contract.[1] Plaintiffs in these consolidated cases are the Federal Deposit Insurance Corporation (FDIC), successor in interest to the failed Security Savings and Loan Association (Security), and the shareholders of Security (Security shareholders).[2] The plaintiffs collectively contend that Security Savings had enforceable contracts with the government with respect to the accounting and capital treatment to be afforded goodwill, cash contributions, and income capital certificates (ICC's) arising out of two merger transactions in the 1980's, and that the passage of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. 101–73, 103 Stat. 183, and its implementing regulations breached those contracts. Defendant contends that neither the FDIC nor the Security shareholders can bring a cause of action in this court and that, regardless, the government never contracted with Security regarding the regulatory treatment accorded goodwill and the assistance involved in the transactions.

After a thorough review of the parties' briefs and the relevant law, with due consideration given to the prior *Winstar*-related opinions issued by this court, the court denies the government's motions to dismiss; denies defendant's motions for summary judgment as to liability; and grants the motions of the FDIC and the Security shareholders for summary judgment as to liability for breach of contract.[3]

## BACKGROUND

The saga of the Security Savings litigation is long. This case originally was initiated by Security Savings in the United States District Court for the Southern District of Mississippi, in an effort to stave off seizure by the government. After conducting an evidentiary hearing, the District Court concluded that the government "was contractually obligated to permit Security Savings to treat the ICC's and cash contribution as a capital asset," and that these obligations survived the passage of FIRREA. *See Security Sav. and Loan Ass'n v. Director, Office of Thrift Supervision,* 761 F.Supp. 1277, 1283–85 (S.D.Miss.1991). The District Court granted Security Savings' request for a permanent injunction against the government from enforcing the provisions of FIRREA in a manner inconsistent with the government's obligations under the agreements. *See Id.*

The United States Court of Appeals for the Fifth Circuit reversed the decision of the District Court, and held that the FIRREA intended to abrogate such agreements, and that as such a claim for compensation needed to be brought before the Court of Federal Claims. *Security Sav. and Loan Ass'n v.*

---

1. During the briefing on the motions, there was some confusion as to whether defendant had or had not filed cross-motions for summary judgment as to liability. In both its responsive briefs to the plaintiffs' two motions for summary judgment as to liability, defendant indicated only that it was filing responses to the motions of the plaintiffs and its own motions to dismiss. However, it appears quite clear from the arguments set forth in the government's briefs that, in fact, the government was moving for summary judgment as to the issue of contract liability. Regardless, thanks to sur-replies allowed by the court, the parties have had the opportunity to fully brief the motions to dismiss and cross-motions for summary judgment. The court's review is further buttressed by the additional briefing ordered by the court as part of the *California Federal* show cause process, *see California Feder-*

al *Bank v. United States,* 39 Fed.Cl. 753, 779 (1997), and the additional Common Issue 11 briefing on the standing of investor and shareholder plaintiffs.

2. The shareholders, who collectively own all the outstanding stock of Security, are H.C. Bailey, Jr., W.C. Bailey, Joan B. Bailey, Harperville Irrevocable Trust, Carol A. Bailey, Malco Irrevocable Trust, John T. Cossar, Glynn Hughes, Lewis S. Tilghman, Kenneth W. Warren and Madison Hills Farm, Inc.

3. The court notes that this opinion does not address the constitutional Fifth Amendment taking claims of plaintiffs, which were not the subject of this phase of dispositive briefing.

*Director, Office of Thrift Supervision,* 960 F.2d 1318, 1323 (5th Cir.1992).[4]

The case was subsequently transferred to the now Court of Federal Claims, and this court determined, upon motion of Security for a temporary restraining order or preliminary injunction to prevent the government from taking any action to interfere with the operations or control of Security, that it lacked the jurisdiction to grant the motion. *See Security Sav. and Loan Ass'n v. United States,* 26 Cl.Ct. 1000, 1003–04 (1992). That decision was upheld on appeal to the Court of Appeals for the Federal Circuit. *Security Sav. and Loan Ass'n v. United States,* 983 F.2d 1085, 1992 WL 349334 (Fed.Cir.1992). Shortly thereafter, the Office of Thrift Supervision (OTS) seized Security Savings and appointed the Resolution Trust Corporation (RTC) as conservator.[5] The court then permitted the RTC to substitute as the real party in interest for Security Savings, and the shareholder plaintiffs filed *H.C. Bailey v. United States,* Case No. 92–817C, and moved to intervene in *Security Savings.* By order dated February 25, 1998, the cases were consolidated for all purposes under Case No. 92–577C and have since proceeded in tandem in preparation for trial.

Two transactions are at the center of this case. The first is the 1984 assisted acquisition of New North Mississippi Federal Savings and Loan Association ("New North") by Security Savings and Loan Association. New North was a federally chartered savings and loan that had been formed to assume the assets and liabilities of a failing state chartered institution, North Mississippi Savings & Loan Association. The second transaction is the 1985 assisted acquisition of Security Trust Federal Savings and Loan Association of Oak Ridge Tennessee, by Bailey Mortgage Company, a wholly-owned subsidiary of Security Savings.

Plaintiffs contend that, in both transactions, the government contractually guaranteed that the cash contributions of the FSLIC and the income capital certificates purchased by the FSLIC could be used to meet regulatory net worth requirements, and that Security could continue to rely on the inclusion of the cash contributions in its net worth account indefinitely. Further, plaintiffs contend that the government guaranteed that Security could use the supervisory goodwill created from both transactions as an amortizing asset for regulatory purposes.

The government challenges several fundamental premises of the claims brought by plaintiffs as well as their right to bring these claims at all. Preliminarily, defendant argues that neither the Security shareholders nor the FDIC can bring suit on behalf of Security, and that hence their claims should be dismissed pursuant to RCFC 12(b)(4) for failure to state a claim upon which relief can be granted. Even were the FDIC and the Security shareholders somehow able to bring suit on behalf of Security, however, defendant contends the government did not contract with Security to guarantee the treatment of supervisory goodwill, and that, as far as the regulatory treatment of the cash contributions and ICC's, Security expressly agreed to language in the transactions shifting the risk of any regulatory change onto Security. The court will thus review the motions to dismiss, and then the parties' contentions about what Security and defendant contractually agreed to in the New North and Security Trust transactions.

### MOTIONS TO DISMISS

The government has filed motions to dismiss against both the FDIC and the Security shareholders. However, in light of prior rulings of the court the motions must be denied. Briefly, defendant has filed two mo-

---

4. In the opinion, the Fifth Circuit referred only to a Fifth Amendment just compensation claim, but the same logic, of course, obtains for a suit founded upon breach of contract.

5. This case has proceeded under procedures developed after the Supreme Court's decision in *United States v. Winstar,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The court has discussed the procedures designed to resolve the fundamental issues of contract breach and standing in other opinions. *See, e.g., Bluebonnet Sav. Bank v. United States,* 43 Fed.Cl. 69, 71 (1999). For more discussion on the crisis in the thrift industry, and the response by regulators to this crisis, see generally the discussion in the Supreme Court's *Winstar* decision. *United States v. Winstar,* 116 S.Ct. 2432, 2440–47 (1996).

tions to dismiss against the Security shareholders: the first, filed in 1993 and subsequently renewed by the government after the stay was lifted in this case, contends that the Security shareholders cannot bring this action in a derivative capacity because, even if the court can entertain derivative suits, *see Suess v. United States*, 33 Fed.Cl. 89 (1995), it is axiomatic that shareholders cannot bring a derivative suit if the corporation—in this case, the FDIC as successor to Security—is bringing suit on behalf of the corporation. However, Issue Judge James T. Turner essentially disposed of that argument, citing *California Housing Sec., Inc. v. United States*, 959 F.2d 955 (Fed.Cir.1992) and *Branch v. United States*, 69 F.3d 1571 (Fed. Cir.1995), in permitting plaintiffs suing derivatively to file amended complaints alleging a cause of action to protect the shareholder interest in the surplus.

Sensing that this line of attack was forestalled by Judge Turner's ruling, defendant contends, in its second motion to dismiss directed against Security's shareholders, that the Security shareholders failed to file an amended complaint that complied with Judge Turner's guidelines for such amended complaints, and that the Security shareholders continue to assert a "direct" claim on behalf of the failed thrift, which they cannot do. Judge Turner's written opinion, which was issued after these motions were briefed, would seem to dispose of both of the motions to dismiss directed against Security's shareholders. Judge Turner, again relying on *California Housing* and *Branch*, concluded:

> Shareholder plaintiffs suing derivatively in the cases affected by FDIC's motion … have a direct, vested interest in the surplus of potential recoveries and, therefore, have standing to remain as plaintiffs in these actions notwithstanding FDIC's appearance on behalf of the failed thrifts.

*Plaintiffs in All Winstar–Related Cases at the Court v. United States*, 44 Fed.Cl. 3, 10 (1999). The government's motion to dismiss on the ground that plaintiff cannot bring a claim when the corporation has brought the claim is thus resolved against the government. The second motion, based on the government's contention that shareholder plaintiffs did not file a complaint that was premised on a "surplus" theory—that in effect shareholder plaintiffs are really trying to bring the claim of the thrift itself—is an unpersuasive semantic argument. Shareholder plaintiffs have never hidden the fact that they are suing derivatively on behalf of the shareholders, and maintain their claim is "direct" in the manner that Judge Turner termed it: "a direct, vested interest in the surplus of potential recoveries." [6]

■ Defendant's motion to dismiss the FDIC for failure to state a claim can be dealt with quickly. Briefly, defendant contends that the FDIC cannot maintain the claim on behalf of the failed thrift because the FDIC sold the claim for, as defendant describes it, valuable consideration, to the RTC–Corporate, an agency of the federal government. Since that claim is now owned by the FDIC–Corporate, also an arm of the government, the FDIC is actually bringing a claim owned by the government against the government: what the government calls a classic nonjusticiable government dispute.

The court has addressed this issue before, in *Glass v. United States*, 44 Fed.Cl. 73, 80–81 (1999), and there is no need to elaborate, since the facts appear indistinguishable. For the same reasons articulated in that opinion, the government's position here is untenable. The FDIC, in several briefs in this case and in Common Issue 11 briefing, has demonstrated the chain of title to show that it is the only party that can bring the claim on behalf of the Security receivership, and that it is

---

**6.** The court does not address the important issue of whether shareholder plaintiffs can recover directly from the government or whether all damages must be channeled through the receivership estate. The court, in both this and Judge Turner's opinion, believes that this determination is appropriately an issue to be resolved during the damage phase of the proceedings, by the Trial Judge. As Judge Turner stated, during a hearing conducted on a Motion for Clarification brought by the Security shareholders regarding his May 20, 1999 opinion on standing issues, in reference to whether damages must flow through the receivership estate: "To the extent about how the money will flow, nothing in my opinion or order should be read as binding a trial judge on that." August 16, 1999 Tr. at 11.

bringing the claim lawfully on behalf of the receivership estate.[7]

## MOTIONS FOR SUMMARY JUDGMENT

■ Defendant does not appear to contest that the agreements made with Security to effect the New North transaction and the Security Trust transaction were binding, dare we say even contracts. Defendant contends, however, that based on the clear contractual language the government never made an agreement as to the regulatory treatment of goodwill created in either transaction. As for the regulatory treatment of the FSLIC cash contribution and the ICC's, defendant contends that both agreements shift the risk of any regulatory change onto Security. The court will address each transaction in turn.

### *The New North Transaction*

In a series of resolutions dated August 2, 1984, the Federal Home Loan Bank Board (FHLBB) determined that an assisted merger of New North with Security Savings would be a less costly alternative to liquidation. FHLBB Resolutions 84–402, 84–403 and 84–404. These resolutions expressly authorized the FSLIC to enter into agreements with Security necessary to implement the merger. On August 3, 1984, the FSLIC and Security executed several agreements, including an Assistance Agreement. The Assistance Agreement contained an integration clause, which states:

> This Agreement ... constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it, excepting only resolutions or letters issued contemporaneously with this Agreement by the Bank Board or the [FSLIC].

Assistance Agreement § 18. The Assistance Agreement thus expressly incorporated the Board Resolutions.

Among the relevant terms here, the FSLIC agreed to infuse New North with $39 million in cash to bring its book value to zero. The FSLIC also agreed to contribute $3.5 million in cash to the resulting thrift, and to issue a $7 million note in exchange for an ICC to be issued by Security. Assistance Agreement § 3(a)(1)(B) and § 4. The FSLIC also agreed to permit Security to include the $3.5 million cash contribution and the $7 million ICC note in its net worth for purposes of complying with the regulatory capital requirements. Assistance Agreement § 3(a)(4).

Plaintiffs contend that the agreement specifically recognized that Security Savings would be entitled to use the purchase method of accounting in connection with the transaction. Plaintiffs point to FHLBB Resolution 84–402, which is incorporated into the agreement pursuant to § 18 of the Assistance Agreement. The Resolution states, in pertinent part, that the newly merged entity:

> shall furnish analyses, accompanied by a concurring opinion from such accountant, satisfactory to the Supervisory Agent, (a) specifically describe, as of the effective date of the merger, any intangible assets on Security's books as a result of the merger, and (b) substantiate the reasonableness of the amounts attributed to such assets, *including goodwill,* and the reasonableness of the related amortization periods and methods. (Emphasis added)

Plaintiffs thus contend that the resolution expressly contemplated the use of supervisory goodwill and its amortization.

Defendant argues that, because the Assistance Agreement is silent as to the issue of the treatment of goodwill, while it expressly addresses the treatment of the cash contribution and the ICC's to net worth, the agreement was designed expressly to exclude any agreement as to the treatment of goodwill. The government thus concludes the following: "Clearly, Section 3(a)(4) was included to indicate that the cash contribution and ICC were to be included in regulatory capital and

---

7. It does bear mentioning that defendant's position regarding who is the proper party in interest boils down to the proposition that there is no person or entity which, either on behalf of the receivership (which, of course, represents any unpaid private creditors and the shareholders) or the aggrieved shareholders, could bring a claim for breach of contract, *even if a contract existed, which the government breached, and which damaged the institution and its shareholders.*

*a fortiori,* goodwill was not." Def.'s Resp. to FDIC at 10.

For several reasons, defendant's argument is unpersuasive. First, as the FDIC points out, the ICC and cash contributions were referenced in the Assistance Agreement, because, at least in part, they are a form of financial assistance from the FSLIC, while the use of supervisory goodwill is an accounting mechanism. It is not, as the FDIC points out, "assistance", in that it does not involve a payment to Security as with the cash contribution and ICC. Second, were everything else in the contract silent about the use of goodwill, defendant might have an argument, but Board Resolution 84–402, which is part of the contract, quite clearly anticipates that plaintiffs were planning to use and amortize goodwill created as a result of the merger. Lastly, were there any ambiguity about the treatment of goodwill, it is certainly clear, at least regarding the New North merger, that the new institution would have been insolvent, and eligible to be seized immediately by regulators, had the new institution not been able to count the supervisory goodwill to meet its capital requirements. Thus, the very nature of the New North transaction suggests that the supervisory goodwill was necessary to make the transaction viable.[8]

The court believes that the question of whether the regulatory treatment of goodwill is a contractual requirement of the New North contract can be resolved without resort to any extrinsic evidence. However, the evidence adduced by the District Court that shows the regulatory treatment of goodwill was an essential term of this contract is absolutely overwhelming. Everything, from the FHLBB supervisory memo explaining the transaction to the Board, to the testimony of Security officers, to the testimony of government regulators themselves, to the conduct of the regulators after the merger, indicates that the government agreed to the accounting treatment requested by Security. The facts were set forth, with great clarity, by the District Court in 1991. *See Security Savings and Loan v. Director, Office of Thrift Supervision,* 761 F.Supp. 1277, 1281–84 (S.D.Miss.1991). In light of this record, the court is surprised that this issue has been challenged so vigorously by defendant.

■ Second, defendant argues that a review of the core documents in the New North transaction reveals that the parties "expressly" shifted the risk of a change of the laws regarding the regulatory treatment of the thrift. The government cites with favor *Guaranty Fin. Serv. v. Ryan,* 928 F.2d 994, 999–1000 (11th Cir.1991), and its favorable footnote invocation in the Supreme Court's *Winstar* decision for the proposition that the risk of regulatory change was shifted to the thrift. *See United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 2440, 2452 n. 15, 135 L.Ed.2d 964 (1996).

The court has discussed both *Guaranty,* and the Supreme Court reference, in a prior decision. *See Castle v. United States,* 42 Fed.Cl. 859, 862–64 (1999). The court has also noted, generally, its reluctance to grant defendant's successor regulation argument much credence *See California Fed. Bank v. United States,* 39 Fed.Cl. 753, 777–79 (1997). There is no doubt, however, that what the Supreme Court found compelling about the language in the *Guaranty* case was its clarity, so, at a minimum, the court must look to see whether the language in this instance was unambiguously clear as to the issue of which party bore the risk of regulatory change. However, the language cited by defendant in the New North transaction, contained in § 3(a)(4) of the Assistance Agreement, which supposedly shifts the risk of all regulatory change onto Security, could hardly be more *unclear.* Given the court's reluctance to accept the government's position that Security would allow bank regulators, at their leisure, to alter critical terms regarding

---

8. The court notes that, as defendant correctly points out, the decision of the District Court was reversed by the Fifth Circuit on this issue, for consideration by this court on a claim for compensation. *See Security Sav. and Loan Ass'n v. Director, Office of Thrift Supervision,* 960 F.2d 1318, 1323 (1992). Tellingly, however, the Fifth Circuit was agnostic as to these conclusions of the District Court regarding the contractual issues in the case. Although the court is not bound by the District Court's findings and conclusions, the court finds the argument and logic of the District Court compelling.

the accounting treatment of goodwill, which could affect the viability of the institution, the government's argument cannot be taken seriously when the language relied upon by defendant is so unclear.[9]

### The Security Trust Transaction

On October 25 1985, Bailey Mortgage Company, a wholly-owned subsidiary of Security Savings acquired Security Trust in an assisted acquisition very similar to the New North transaction. The Security Trust transaction was implemented pursuant to an Assistance Agreement signed by Security Savings, Bailey Mortgage, Security Trust and FSLIC. The Assistance Agreement, as in the New North transaction, contained an integration clause that expressly incorporated the contemporaneous documents and FHLBB board resolutions. Briefly, the transaction involved a cash contribution of $1.442 million, and the purchase of a $2 million ICC, by the FSLIC. In addition, the transaction permitted Bailey to include the cash contribution and ICC in its regulatory net worth.

Defendant makes the identical argument regarding the treatment of goodwill created as a result of the transaction, and for the same reasons discussed above regarding the New North transaction, the government's argument is unavailing.

As with the New North transaction, defendant argues that "successor regulation" language contained in the Security Trust Assistance Agreement explicitly shifted the risk of regulatory change onto Bailey Mortgage. Although defendant's argument in this in-stance is a bit more viable than the successor regulation argument regarding the New North transaction, because in this instance there is actually language in the Assistance Agreement to which defendant can point, the argument is ultimately no more compelling.

Defendant does concede in its briefing that its argument here is similar to that addressed in Common Issue 12 as part of the *California Federal* common issue process, but defendant nonetheless believes that it merits a closer look because the language in the Security Trust agreement is substantially similar to that used in *Guaranty*. However, a quick review of the language cited in *Guaranty* and that used in the Security Trust transaction proves this is not the case The relevant language in the *Guaranty* deal contains a sentence which reads:

> All reference to regulations of the Board or the FSLIC used in the Agreement shall include any successor regulation thereto, *it being expressly understood* that subsequent amendments to such regulations may be made and that *such amendments may increase or decrease the Acquiror's obligation under this Agreement* (emphasis added by the 11th Circuit).

*Guaranty* at 999. There is no equivalent language in the Security Trust Assistance Agreement or any other contract document. It appears, then, that there is no substantive difference between the generalized successor regulation language in the Security Trust Assistance Agreement and in the cases discussed in *California Federal*. See *California Fed.* at 777–79. As in that case, the government argument here is similarly flimsy.[10]

---

9. Indeed, it appears from the briefing that the government may not even take the successor regulation argument, at least as it applies to the New North transaction, very seriously. It only merits very brief attention in the government's initial responses to the motions of the shareholder plaintiffs and the FDIC for summary judgment, and is not addressed at all in the government's 90–day response to the FDIC's motion for summary judgment.

10. Two other points bear mentioning. First, as the FDIC points out in its briefing, defendant points to language in the assistance agreement which requires maintenance of the *amount* of regulatory net worth over time, but then attempts to argue that Security was also liable for any changes in what could be *included* in net worth.

Defendant's own argument requires a jump in logic that suggests this successor regulation language is far from unambiguous as defendant suggests it is here.

Second, the government's point once again raises the fundamental implausibility of this entire line of argument. The government would have this and other agreements read in such a way that one of the contracting parties—in this case, the government—could at any time and for any reason fundamentally alter the terms of the agreement in such a way that the very survival of the institution could be jeopardized at the government's option. It is difficult to fathom that a rational contracting party would agree to such terms.

**10**

## CONCLUSION

■ The court concludes that Security Savings entered into a contract with the government to permit the thrifts to count supervisory goodwill and certain other items, including the FSLIC cash contributions and ICC's, in computing their regulatory capital requirements, and that the passage of FIR-REA and its implementing regulations breached those contractual commitments. Although this issue was not the focus of the briefing on summary judgment, the court finds the analysis of the District Court persuasive regarding the applicability of the termination provisions of the New North and Security Trust Assistance Agreements and adopts the District Court's findings that the obligation as to the regulatory treatment of the cash contributions and ICC's was not terminated under the Termination provisions of the Assistance Agreements. *See Security Savings and Loan Association v. Director, Office of Thrift Supervision*, 761 F.Supp. 1277, 1279–81 (S.D.Miss.1991). In addition, the court concludes that both the FDIC and the Security shareholders may pursue the claims on behalf of the failed thrift and its shareholders, although how damages will be distributed, should damages be found, is a question left for the Trial Judge.

Accordingly, the motions of the Security plaintiffs and the FDIC for summary judgment as to liability are granted, and the cross-motions of defendant, to the extent that cross-motions were filed, are denied. The motions of defendant to dismiss plaintiffs are also denied. It is further ordered that, pursuant to RCFC 77(f), the Omnibus Case Management Order (September 18, 1996), and the Priority Cases Pretrial Scheduling Order (April 2, 1997), this case is assigned to Judge Emily C. Hewitt for all further proceedings, except for motions for clarification of this opinion.