FEDERAL DEPOSIT INSURANCE COR-
PORATION, as Successor in Interest to
Security Savings, Bailey Mortgage Com-
pany, Security Federal Savings and
Loan Association; and H.C. Bailey, Jr.,
et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 92–577 C, 92–817 C.

United States Court of Federal Claims.

Dec. 21, 2001.

Richard M. Schwartz, Washington, DC, counsel of record for Plaintiff. John M. Dorsey, Dorothy A. Doherty, and Richard Gill, of counsel.

Mary C. Gill, Atlanta, GA, counsel of record for Shareholder Plaintiffs. Alan W. Perry, Jackson, MS, of counsel.

William F. Ryan, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, counsel of record for Defendant, with whom were Jeanne E. Davidson, Assistant Director; David M. Cohen, Director; and Stuart E. Schiffer, Deputy Assistant Attorney General. James L. Anderson, Gregory R. Firehock, Daniel D. McClain, Thomas P. Reilly, Patricia A. Smith, of counsel.

## OPINION

DAMICH, Judge.

Presently before the Court are the Defendant's motion for summary judgment as to damages, the Shareholder Plaintiffs' motion for bifurcation, and briefings on the standing of the FDIC to pursue its damages claims as directed by the Court's Order to Show Cause. For the reasons enumerated below, the Defendant's motion for summary judgment is GRANTED in part, and the Plaintiff's motion for bifurcation is DENIED. All goodwill claims that were not disposed of in the Defendant's motion for summary judgment are dismissed due to the absence of a case or controversy between the Federal Deposit Insurance Corporation ("FDIC") and the United States. Consequently, the Shareholder Plaintiffs' contingent goodwill claims are extinguished.

## I. Background

This is a long-standing *Winstar*-related case. The Plaintiffs are the FDIC, as successor-in-interest to the failed Security Savings and Loan Association of Jackson, Mississippi ("Security Savings") and, appearing separately, the shareholders of Security Savings ("Shareholder Plaintiffs").[1] The Plaintiffs seek damages for losses incurred by Security Savings when the Federal Savings and Loan Insurance Corporation ("FSLIC") breached contracts that permitted Security Savings to count supervisory goodwill and certain other items, including FSLIC cash contributions and income capital certificates ("ICC's"), in computing its regulatory capital requirements ("goodwill claims"). These contractual commitments were breached by the passage of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. 101–73, 103 Stat. 183, and its implementing regulations. These contracts are discussed in further detail in the Court's opinion in *FDIC v. United States*, 47 Fed.Cl. 2, 4–5 (2000). Although Security Savings itself originally pursued its claims in what is now the U.S. Court of Federal Claims, the Resolution Trust Corporation ("RTC"), in its capacity as receiver for Security Savings, was substituted as Plaintiff for Security Savings after Security Savings was seized by the Office of Thrift Supervision ("OTS") and the RTC was appointed as Security Savings' conservator.[2] The resulting transfer of the ownership of the goodwill claims and takings claims from Security Savings to the FDIC is described in detail in the next section. The Shareholder Plaintiffs possess their own takings claim independent of the takings claim of Security Savings.

## II. Ownership of Security Savings' Goodwill Claims

The FDIC, as manager of the FSLIC Resolution Fund ("FRF"), came into control of the ownership of Security Savings' goodwill

---

1. The Shareholder Plaintiffs, who collectively own all of the outstanding stock of Security, are H.C. Bailey, Jr.; Joan B. Bailey; Harperville Irrevocable Trust; Carol Bailey; Malco Irrevocable Trust; John T. Cossar; Glynn Hughes; Lewis S. Tilghman; Kenneth W. Warren; and Madison Hills Farm, Inc.

2. Subsequent to the substitution of the RTC as Plaintiff, the Shareholder Plaintiffs filed *H.C. Bailey v. United States*, Case No. 92–817C, which consisted of the same allegations as the original *Security Savings* action. These two cases were consolidated under Case No. 577C in 1997.

claims through a complicated series of transactions. These transactions have some bearing on the issue of whether the FDIC can recover for the "receivership deficit" of Security Savings and, ultimately, whether a case or controversy exists between the United States and the FDIC. Therefore, these transactions will be discussed in some detail. First, OTS seized the assets of Security Savings on October 16, 1992, and appointed the RTC as receiver for Security Savings in what is known as a "pass-through receivership." Def.'s Resp. to the Court's Order To Show Cause (*hereinafter* "Def.'s Br.") at App. 111–14. As receiver, the RTC succeeded to all of Security Savings assets, including any goodwill claim that Security possessed. 12 U.S.C. §§ 1441a(b)(4)(A), 1821(d)(2)(A)(i) (1994). Simultaneously, the OTS issued a charter for a new institution called Security Federal Savings and Loan Association ("Security Federal"), for which the RTC was appointed as conservator. Def.'s Br. at App. 111–14. All of the assets and most of the liabilities of Security Savings were transferred from the Security Savings receivership, operated by the RTC, to Security Federal by means of a purchase and assumption agreement. Def.'s Br. at App. 115–44. In consideration for this transaction, Security Federal promised to pay the Security Savings pass-through receivership any funds that remained after all of Security Federal's liabilities were paid. Def.'s Br. at App. 125–26. As a result, the shareholders of the old Security Savings, now the Shareholder Plaintiffs in this action, possessed a contingent interest in funds contained in the Security Savings pass-through receivership.

The RTC operated Security Federal in conservatorship until April 15, 1994, when a series of events took place simultaneously that, in effect, ended the operation of Security Federal. First, OTS appointed the RTC as receiver for Security Federal. Def.'s Br. at App. 23–25. As receiver, the RTC succeeded to all of the assets of Security Federal, including the goodwill claims. 12 U.S.C. §§ 1441a(b)(4)(A), 1821(d)(2)(A)(i). Second, the RTC sold certain assets of Security Federal, including the goodwill claims, to the RTC acting in its corporate capacity. Def.'s Br. at App. 24–30, 153–54. In the contract of

sale, RTC–Corporate promised that, if it realized any money on the assets it purchased, including the goodwill claims, it would first pay the expenses that it incurred in liquidating the assets, plus interest. Def.'s Br. at App. 154 (Contract of Sale § 2.3). Any excess monies would be refunded to the Security Federal receivership for distribution in accordance with the statutory priority scheme set forth in 12 U.S.C. § 1821(d)(11). Def.'s Br. at App. 150–54 (Contract of sale §§ 1.1, 2.3).

At the same time, the RTC, as receiver for Security Federal, sold certain assets of Security Federal, as well as all of Security Federal's deposit liabilities, to several financial institutions. Def.'s Br. at App. 145. Because the assets that were sold to them were worth less than the deposit liabilities assumed by the acquiring financial institutions, RTC–Corporate provided them with approximately $84.3 million in additional funds. Def.'s Br. at App. 146. That amount represents RTC–Corporate's original subrogated claim against the Security Federal receivership. Due to continued liquidation of assets of Security Federal, the subrogated claim was reduced over time. That subrogated claim was reduced to $42.6 million but with interest stands in excess of $64.1 million as of year-end 2000. Def.'s Br. at App. 163. However, this receivership deficit now grows over time as it accrues interest. As of October 31, 2001, the subrogated claim of the FRF is now in the amount of $66,389,996. Pl. FDIC's December 11, 2001 Status Report at 2.

The RTC was terminated by operation of law on December 31, 1995, and all assets and liabilities held by RTC–Corporate, including the goodwill claim and the RTC's subrogated claim against the Security Federal receivership, were transferred to the FRF. 12 U.S.C. § 1441a(m)(1)-(2). This portion of the FRF is known as FRF–RTC. The FRF–RTC is managed by the FDIC acting in its corporate capacity. 12 U.S.C. §§ 1811, 1821a(a)(1). Separately, the FDIC, acting in its capacity as receiver, succeeded to the RTC, acting in its capacity as receiver. 12 U.S.C. § 1441a(m)(1).

## III. Distribution Scheme of Damages

Assuming that this Court were to award damages in this case, the FDIC, as manager of the FRF–RTC, would, following the chain of transactions outlined in the previous section, distribute recovery in the following order. First, pursuant to the contract of sale by which the RTC acquired Security Savings' goodwill claim, the FDIC would pay the FRF–RTC the expenses it incurred in pursuing the goodwill claim, any advances the FRF–RTC made to Security Federal, and interest on both. Second, the FDIC would then use any excess monies to satisfy FRF–RTC's subrogated claim against the Security Federal receivership. 12 U.S.C. § 1821(d)(11) ("Any deposit liability of the institution" [has priority over] "any other general or senior liability of the institution.") *See also Glass v. United States*, 258 F.3d 1349, 1355–56 (Fed.Cir.2001), *as amended on reh'g, Glass v. United States*, 273 F.3d 1072 (Fed.Cir.2001) ("While any net recovery by the FDIC would be distributed to creditors under the statutory scheme applicable to the . . . receivership, in this case, FRF–RTC has priority over all of the creditors under this statutory scheme."); *Landmark Land Company v. United States*, 256 F.3d 1365, 1381 (Fed.Cir.2001). Third, if any funds remained, it would distribute the funds to other outstanding creditors of the Security Federal receivership, pursuant to the statutory scheme in 12 U.S.C. § 1821(d)(11). Fourth, if any funds remained after all outstanding creditors of the Security Federal receivership have been satisfied, those funds would be distributed to any remaining creditors of Security Savings through the pass-through receivership of Security Savings. As shareholders of Security Savings, the Shareholder Plaintiffs would be the last creditors to be paid by the pass-through receivership of Security Savings. 12 U.S.C. § 1821(d)(11)(v).

## IV. The FRF as Payer of Judgments and as Creditor

The FRF, of which the FDIC is the manager, serves as both creditor of Security Federal and payer of any judgment in this case. The dual roles of the FRF are significant as to whether the FDIC can recover for the FRF's subrogated claim and the receivership deficit of Security. The FSLIC, as stated above, was the party that breached the contractual obligations at issue in this case. However, with the enactment of FIRREA, the FSLIC was abolished, and all of its assets and liabilities were transferred to its successor, the FRF. 12 U.S.C. § 1821a(a)(1), (a)(2)(A). The assets and liabilities of the former FSLIC are accounted for in a fund within the FRF separate from FRF–RTC. This separate fund is called FRF–FSLIC. Thus, FRF–FSLIC would pay the judgment of any recovery that the Court might grant in this case because it is the successor of the breaching party. *Landmark*, 256 F.3d at 1381; *Glass*, 258 F.3d at 1355. At the same time, FRF–RTC is the largest creditor of the Security receivership, with a subrogated claim of approximately $66.4 million. The only creditors with plausible claims against the Security Federal receivership are third-party creditors. Def.'s Br. at 163. Because there are no uninsured depositor claims against the Security Federal receivership, in effect, FRF–RTC has priority, in this case, over all other creditors under the current national depositor preference statute.[3]

Finally, if the FRF is unable to recover on any deficit, the Secretary of the Treasury is required to provide the FRF with sufficient funds to satisfy any liabilities. 12 U.S.C. § 1821a(c)(1). Upon dissolution of the FRF, any remaining surplus of funds shall be paid into the Treasury. 12 U.S.C. § 1821a(f).

## V. Standard for Summary Judgment

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Jay v. Secretary, DHHS*, 998 F.2d 979 (Fed. Cir.1993). The party moving for summary

---

**3.** The current national depositor preference statute that Congress enacted in 1993 in the Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103–66, § 3001(c), 107 Stat. 312, 337 (August 10, 1993) (codified at 12 U.S.C. § 1821(d)), applies to the Security Federal receivership because it was instituted on April 15, 1994.

judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). The court must resolve any doubts about factual issues in favor of the non-moving party, *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307 (Fed.Cir.1998), and draw all reasonable inferences in its favor. *See Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed.Cir.1995)

## VI. The FDIC Cannot Recover Under Any Of Its Theories Of Damages.

The FDIC has presented five theories of recovery in this case. First, the FDIC seeks expectancy damages in the amount of $208.6 million, which it believes to represent the "lost value" of Security Savings as of year-end 1998. Def.'s Br. at App. 78–79, 92–94, 97–99. This amount is equal to the difference between the receivership deficit of Security Federal as of year-end 1998 ($68.2 million) and the market value of the assets of Security Savings that, but for the breach, the FDIC maintains that Security Savings would have had as a result of its de-banking strategy as of year-end 1998 ($140.4 million).[4] Second, in the alternative to year-end 1998, the FDIC seeks expectancy damages in the amount of $64.0 million, representing what it argues is the "lost value" of Security Savings as of year-end 1994. Def.'s Br. at App. 78–80, 92–96, 100–02. This amount represents the market value of what the FDIC maintains that, but for the breach, Security Savings would have had as of year-end 1994 pursuant to its de-banking strategy ($15.0 million) and the deficit of the Security receivership at year-end 1994 ($49.1 million). Year-end 1994 represents the date that, according to the FDIC's theory, Security Savings would have exited the thrift business in the absence of the breach. Third, in the alternative, the FDIC seeks a restitution claim in the amount of $5.5 million for the asserted value that Security Savings contributed to the transactions at issue in this case. Def.'s Br. at App. 77–78, 90–92. Fourth, in the alternative, the FDIC seeks $7.2 million for the cost of replacing Security Savings' goodwill at the time of the transactions at issue here. Def.'s Br. at App. 75–76, 83–90. The fifth and final theory of recovery for the FDIC is for the cost of replacing Security Savings' goodwill at the time of the breach, in the amount of $5.4 million. Def.'s Br. at App. 76, 83–90.

### A. The FDIC's "Lost-value" Claim as of Year-end 1998

The FDIC's "lost-value" claim as of year-end 1998 consists of the difference between the receivership deficit of Security Federal as of year-end 1998 ($68.2 million) and the proposed value that Security Savings would have had at year-end 1998 ($140.4 million). This value is predicated on a theory, called the de-banking strategy, that, in the absence of the breach, Security Savings would have exited the thrift business by 1994 and pursued other commercial interests. The total damages claim is $208.6 million.

### 1. The FDIC Cannot Recover for the Receivership Deficit of Security Federal.

█ The receivership deficit consists of the shortfall that occurred after Security Federal's assets were liquidated and after the RTC made deposit insurance payments for the benefit of the former depositors of Security Federal. The deficit also includes interest and tax liability. However, the largest component of the receivership deficit is the subrogated claim of the FRF–RTC in the amount of $42.6 million plus interest, for a total of $64.1 million as of year-end 2000. As of October 31, 2001, the total subrogated claim is in excess of $66 million. The FDIC argues that the receivership deficit is a component of a "unitary" expectancy damages claim of Security comprising of (a) the cost of the receivership deficit that would have been

---

4. The de-banking strategy refers to the Plaintiffs' postulation that, but for the breach, Security Savings would have exited the thrift business in 1994 and pursued other commercial interests. *See generally infra*, § VI(A)(2) on the de-banking strategy. The FDIC seeks expectancy damages

for the lost value of Security calculated up until the time of the satisfaction of the judgment. However, because the expert report in this case was submitted to the Government on February 9, 1999, the expectancy damages sought have only been calculated up until year-end 1998.

avoided had the contractual obligations of the Government not been breached and (b) the amount that Security Savings would have earned until 1994 (and beyond) when Security Savings would supposedly have "de-banked." *See generally infra,* § VI(A)(2) regarding the de-banking claim. However, the Defendant argues, convincingly, that the FDIC cannot recover for the receivership deficit of Security Federal because the receivership deficit is not a claim of Security Federal as such, but is instead a claim of the Government (the FDIC), and also because the dispute over the receivership deficit is a non-justiciable intra-governmental controversy.

First, the FDIC cannot pursue the receivership deficit claim in this case because the Federal Circuit in *Landmark* and *Glass* clearly stated that the subrogated claim of the FRF is a "claim of the Government." *Landmark,* 256 F.3d at 1381; *see also Glass,* 258 F.3d at 1355. The holding of the Federal Circuit is directly applicable to this case because the subrogated claim of the FRF cannot be, properly speaking, a claim of Security Federal, but remains, as it was prior to its liquidation, an obligation of Security Federal to its depositors, which it now owes to the FRF as subrogee. *See Castle v. United States,* 48 Fed.Cl. 187, 198 (2000); *Hansen Bancorp. Inc.,* 49 Fed.Cl. 168, 176 n. 12. This subrogated claim represents the loss absorbed, not by Security Federal, but by the RTC when it paid off the depositors of Security Federal. The receivership deficit claim, therefore, was never owned by Security Federal, but only owned by the RTC as subrogee and now transferred to the FRF as the successor to the RTC. Furthermore, the subrogated claim represents liabilities of Security Federal that cannot now, through a breach of contract claim, be converted into an asset of Security Federal. The FDIC, as successor-in-interest to Security Federal, can only recover damages suffered by Security Federal and not damages suffered by the deposit insurer such as the receivership deficit. *See Statesman Sav. Holding Corp. v. United States,* 41 Fed.Cl. 1, 12 (1998) ("Because any damage suffered as a result of the receivership deficit has been suffered by the

FRF, not [the thrift], this element of plaintiff FDIC's claim must be dismissed.")

■ A second reason why the FDIC cannot pursue the receivership deficit claim follows from the FRF's position as both payer of judgments and as creditor in this action. Any judgment in this case, including the receivership deficit—if such sums were to be recovered—would be paid by FRF–FSLIC into the FRF–RTC fund. The result would be a transfer of funds from one portion of the FRF's accounting ledger to another. Because the FDIC, a government agency, is paying itself, the receivership deficit claim is a non-justiciable intra-governmental controversy. Moreover, the Treasury is required by statute to satisfy any unfunded liability of the FRF and is likewise the recipient of any surplus from the FRF upon its dissolution. *See* 12 U.S.C. §§ 1821a(c), 1821a(f). As articulated in *Statesman:*

> If the receivership deficit claim were allowed, the result would be a federal agency, FDIC-corporate, litigating against the United States Department of Justice with the goal of causing a large portion of any damages recovered to be transferred from one Treasury account to another. Such a result would be nonsensical in that the United States Treasury has already provided the FRF with the funds used to make depositors of failed thrifts whole, is required to fund any FRF deficit, and will be the beneficiary of any FRF surplus.

*Statesman,* 41 Fed.Cl. at 13.

Therefore, there is no possibility that the failure of the FDIC to recover the receivership deficit would result in an increase of the liability of the government. Accordingly, because the receivership deficit claim is, ultimately, a non-justiciable intra-governmental dispute, the FDIC cannot recover damages for it. *See also Castle,* 48 Fed.Cl. at 199.

2. The FDIC Cannot Recover Expectancy Damages Under a De-Banking Strategy After 1994.

■ The FDIC seeks a lost-profits theory of expectancy damages predicated upon what it calls a "de-banking" plan as described by the Shareholder Plaintiffs' experts, Nevins

Baxter and Paul Salvo. The FDIC claims that, even if the Government had not breached its contractual obligations to Security Savings, the non-breach provisions of FIRREA would have prevented Security Savings from simultaneously participating in the thrift business and engaging in direct investment in real estate and other equity investments such as financial institutions. Faced with a choice between these two lines of business, Security Savings would have chosen to continue managing its real estate and other equity holdings and to exit the thrift business by means of a "de-banking" strategy. The de-banking strategy would have consisted of several steps. First, Security Savings would have sold its mortgage banking and servicing operation in 1990. Def.'s Br. at App. 54–55. It would have re-purchased ICC's held by the FRF. Def.'s Br. at App. 61. It would have then relinquished its thrift charter and sold its retail banking franchise (including its deposits and branch offices) in 1994. Def.'s Br. at App. 55–57. It would have then held on to its remaining assets and changed the name of the corporation to the hypothetically named "SS Inc." SS Inc. would then serve as an investment holding company for direct investments in financial institutions and real estate that would appreciate over time. SS Inc. would also have collected or disposed of remaining commercial loans and retained foreclosed real estate properties. Def.'s Br. at App. 57–64. The expectancy damages sought by the FDIC would include the net proceeds raised from the de-banking strategy described above and the wounded-bank damages[5] avoided by Security Savings, all of which Security Savings would have accrued but for the breach. Def.'s Br. at App. 52. As of year-end 1998, the estimated amount of damages would be approximately $140.4 million, though that amount would likely be higher if calculated today. Def.'s Br. at App. 71.

Assuming for the sake of argument that this Court were to accept the FDIC's proposed de-banking strategy, the FDIC could not possibly recover damages for any damages suffered by Security Savings beyond 1994. Under the FDIC's own strategy, the successor entity of Security Savings would not operate as a thrift after 1994. While it is certainly true that successor corporations can own goodwill claims—such as when California Federal Savings Bank acquired Glendale Federal Bank and its goodwill claims, *Glendale Federal Bank, FSB v. United States,* 239 F.3d 1374, 1378 (Fed.Cir.2001)— SS Inc. is neither a bank nor a thrift and has no use for supervisory goodwill. Had Security Savings, but for the breach, de-banked, the benefits of the contractual obligation of the Government to count goodwill towards regulatory capital would not flow to SS Inc., but would instead flow to the purchaser of the thrift's business. The FDIC can, as the successor-in-interest and as receiver to Security Savings, possess the contractual claims of what Security Savings could have possessed but for the breach. 12 U.S.C. §§ 1441a(b)(4)(A); 1821(d)(2)(A)(i); *O'Melveny & Myers v. F.D.I.C.,* 512 U.S. 79, 86, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) (as receiver, the RTC and FDIC "step[ ] into the shoes" of a failed thrift). However, the FDIC possesses no greater authority than Security Savings had it survived. *Waterview Mgmt. Co. v. F.D.I.C.,* 105 F.3d 696, 701 (D.C.Cir.1997); *Statesman,* 41 Fed.Cl. at 11. Therefore, in the non-breach world, SS Inc. could not possibly have retained the benefits of the contract. Assuming that the FDIC can recover lost profits deriving from a de-banking strategy constructed *post hoc,* it can only do so no later than year-end 1994.[6]

---

**5.** " 'Wounded bank' damages have been defined as costs resulting from a bank's 'perilous financial condition' created by a breach of contract." *Coast Federal Bank, F.S.B. v. United States,* 48 Fed.Cl. 402, 434 (2000) (citing *California Federal Bank v. United States,* 43 Fed.Cl. 445, 448 (1999), *rev'd on other grounds,* 245 F.3d 1342 (Fed.Cir. 2001)).

**6.** The Defendant also argues that, as a matter of law, the FDIC's expectancy damage claim, and its de-banking strategy in particular, is unforeseeable and that there is a lack of causation between it and the breach. However, as will be explained in the following section, the amount sought for the expectancy damage claim as of year-end 1994 is insufficient to establish a case or controversy with respect to the FDIC's contract claims. Therefore, the Court will not address these issues.

B. The Remaining Damage Theories Do Not Present a Case or Controversy Between the FDIC and the Federal Government.

■ Article III, § 2 of the U.S. Constitution restricts federal courts from deciding any issue other than "Cases" or "Controversies." *Arizonans for Official English v. Ariz.*, 520 U.S. 43, 64, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). Incorporated within the case or controversy requirement is the standing of a party to sue. *Id.* In order for a party to have standing, there must be a true adverse relationship between the parties. *Aetna Life Ins. v. Haworth*, 300 U.S. 227, 240, 57 S.Ct. 461, 81 L.Ed. 617 (1937). In this case, the FDIC cannot establish an adverse relationship between itself and the Government because, assuming that the FDIC obtained a judgment on any of its remaining damages theories, none of the money paid by FRF–FSLIC would ever be received by anyone other than FRF–RTC. *Landmark*, 256 F.3d at 1382; *Glass*, 258 F.3d at 1355–56. As stated above, the subrogated claim of the FRF–RTC in this case against Security Federal is in excess of $66 million dollars. The subrogated claim of the FRF–RTC against Security Savings exceeds the $64 million that remains from the FDIC's expectancy damage claim as of year-end 1994, excluding the receivership deficit component which is unrecoverable for the reasons stated above. The subrogated claim of the FRF–RTC far exceeds the FDIC's theories of recovery valued by a restitution theory or valued by the cost of replacement of goodwill at either the time of the transactions at issue in this case or at the time of the breach. The damages that could be recovered from these theories are $5.5 million, $7.2 million, and $5.4 million respectively. Because there are no other creditors in this case, such as uninsured depositors, that could have the same priority as the FRF, all pro-ceeds from the judgment would be used by the FRF to pay itself.

Furthermore, as stated above, the U.S. Treasury is required by statute to fund any deficit remaining in the FRF and is the beneficiary of any surplus of the FRF at its dissolution. Because the FRF is fully funded, recovery by the FRF does not affect third-party creditors with claims against the FRF. *Landmark*, 256 F.3d at 1381. Therefore, when faced with the situation outlined in *Landmark* and *Glass* where there are no third party creditors that could recover damages or are otherwise on a par with the FRF–RTC, the FDIC cannot recover the claims of the FRF–RTC because such claims do not present a case or controversy.[7]

There is, however, one difference between the claims in this case and the claims in *Glass* and *Landmark*, and that is the nature of the claims of the Shareholder Plaintiffs. In *Landmark*, the FDIC was an intervening party whose claims were independent of that of the original plaintiff, Landmark, which was also permitted to remain in the case as a co-plaintiff. *Landmark*, 256 F.3d at 1382. In *Glass*, the shareholder plaintiffs were "at most incidental beneficiaries of the contract with no rights to enforce the contract against the United States." *Glass*, 258 F.3d at 1355. In the present case, the FDIC is the successor to the thrift and the Shareholder Plaintiffs intervened in this case to sue "derivatively on behalf of the shareholders, and maintain their claim ... in the manner that Judge Turner termed it: 'a direct, vested interest in the surplus of potential recoveries.'" *F.D.I.C.*, 47 Fed.Cl. at 6. The claims at issue in *Glass* or *Landmark*, unlike the present case, did not involve derivative claims.

Notwithstanding these differences, the holding of *Glass* and *Landmark* is directly applicable to the present case. "Critical to the issue of standing, then, is the fact that adjudication of the FDIC's claim cannot af-

---

7. Importantly, the FDIC concedes that no third-party creditor or stockholder would have any recovery in this specific case:

   [W]ere this court to hold, in our view erroneously, that the FDIC's recovery on its lost profits/lost equity value claim as of 1994 was limited to recovery of an amount equal to the positive equity value Security Savings should have had in 1994 absent the breach, under the facts of this particular case, the evidence currently indicates that any such recovery would not result in recovery by any third party creditor or stockholder.

   Pl FDIC's Response to Proposed Stipulation 4.

fect any party other than the government." *Landmark,* 256 F.3d at 1381. If, for the sake of argument, the FDIC were to adjudicate the remaining claims, the monies paid by FRF–FSLIC would be used to partially satisfy the subrogated claim of FRF–RTC. Because there would be no monies left over, the Shareholder Plaintiffs could not receive any recovery insofar as they only have an interest in the "surplus of potential recoveries." *F.D.I.C.,* 47 Fed.Cl. at 6. The Shareholder Plaintiffs are, therefore, no worse off if the FDIC's contract claims are dismissed than they would be if the FDIC adjudicated its claims: in both cases the amount of surplus recovery is zero. Logically, therefore, the FDIC's goodwill claims should be dismissed for lack of a case or controversy. Likewise the Shareholder Plaintiffs contingent goodwill claims also should be dismissed because, as there is no possibility of any surplus recoveries that they can receive, their claims are extinguished.

## VII. The Goodwill Claims Of The Shareholder Plaintiffs And The FDIC Cannot Be Bifurcated.

■ To prevent dismissal of all goodwill claims the Shareholder Plaintiffs have filed a motion to bifurcate the contract claims of the FDIC and the shareholders.[8] They maintain that the claims must be bifurcated because the FDIC, due to what Judge Miller aptly described as its "hydraheaded"[9] role in *Winstar*-related proceedings because it is the successor-in-interest to both the breaching party and the original plaintiff, has been effectively precluded from pursuing the contract claims of Security Savings. In particular, the Shareholder Plaintiffs maintain that the duties imposed by statute upon the FDIC present insuperable conflicts of interest. These roles include its duty as receiver of Security Savings, 12 U.S.C. § 1441a(m)(1); as owner of the claims of Security Federal as manager of FRF–RTC, 12 U.S.C. § 1441a(m)(2); and as successor to the obligations of the breaching party FSLIC in its role as manager of FRF–FSLIC, 12 U.S.C. § 1821a(a)(1). Moreover, the Shareholder Plaintiffs argue that they could be precluded by statute from challenging any amount that the FDIC will pay itself as manager of the FRF–RTC or otherwise challenging the FDIC's application of the priority scheme. 12 U.S.C. § 1821(d)(13)(D) (bars judicial review of any "claim or action for payment from" or "action seeking a determination of rights with respect to" any "asset" of a failed bank). *But see* 12 U.S.C. § 1821(d)(6) (providing administrative review "with respect to any claim against a depository institution for which [the FDIC] is receiver" in the district court where the failed bank had its principal place of business or the U.S. District Court for the District of Columbia); *Freeman v. F.D.I.C.,* 56 F.3d 1394, 1400 (D.C.Cir.1995). They maintain that, because of the failure of the FDIC to effectively pursue the goodwill claims of Security Savings, bifurcating their derivative claim from the contract claim of the FDIC provides them with the right to recover "surplus" from Security's expectancy damage claim directly from the Government. As justification for this motion, they cite the Federal Circuit's decisions in *Branch v. United States,* 69 F.3d 1571 (Fed.Cir.1995), and *California Housing Securities, Inc. v. United States,* 959 F.2d 955 (Fed.Cir.1992), as well as Judge Turner's non-binding opinion in *Plaintiffs in All Winstar-Related Cases v. United States,* 44 Fed.Cl. 3 (1999) as holding that their rights as shareholders are "independent of, and equal to, those of the FDIC." Pl.'s Mot. to Bifurcate at 17.

In response to this Court's Order to Show Cause, however, the Shareholder Plaintiffs have seemingly backed away to a degree from their implied assertion that they can appropriate the goodwill claims of Security for themselves. Instead, they request the Court to stay the FDIC's goodwill claims, and permit the shareholders to litigate Security Savings' contract claim derivatively and the shareholders' own takings claim. The Shareholder Plaintiffs propose that if any damages are recovered, the FDIC could not

---

8. This motion to bifurcate was filed in response to the Defendant's motion for summary judgment based upon the FDIC's inconsistent statements which, if the Court had granted, would have dismissed the contract claims of both the FDIC and the shareholders.

9. *Statesman,* 41 Fed.Cl. at 13 n. 17.

recover the portion of the damages that belongs to it, but that the "surplus" of such damages could be recovered by the shareholders. However sympathetic the Court is to the frustrations of the Shareholder Plaintiffs that they may recover nothing as a consequence, perhaps in part, of the seemingly conflicting roles that Congress mandated the FDIC to perform even though they initiated this case and pursued their goodwill claims for many years, their unique proposal to bifurcate the claims of the plaintiffs is in itself impossible and could not, in any event, salvage the goodwill claims in this case even if their motion were to be granted.

First, a motion to bifurcate is a procedural device to promote the smooth administration of claims. *Bull HN Information Sys. Inc. v. Hutson*, 229 F.3d 321, 329 (1st Cir.2000). The Shareholder Plaintiffs cannot show that a procedural device can create substantive rights that otherwise would not exist. The Shareholder Plaintiffs certainly cannot, through bifurcation of the goodwill claims, directly obtain a judgment in this case for themselves from the Government, under the guise of a derivative action, for damages in the place of the FDIC when the FDIC is the proper owner of the goodwill claims of Security Savings.

> The procedural device of derivative actions does not broaden the scope of the waiver of sovereign immunity. Rather, in circumstances in which those in control of the management of the corporation are unable or unwilling to bring suit, it permits shareholders to step into the shoes of the corporation and file suit as fiduciaries on the corporation's behalf and for the corporation's benefit.

*First Hartford Corp. Pension Plan & Trust v. U.S.*, 194 F.3d 1279, 1293 (Fed.Cir.1999). Functionally, this means that shareholders of a failed thrift cannot assert a direct claim against the United States. "[O]ne of the principal motivations behind utilizing the corporate form is often the desire to limit the risk of ownership to the amount of capital invested and thus avoid the obligations, contractual or otherwise, of the corporation. Consequently ... shareholders may not bring breach of contract claims on their own

behalf in the Court of Federal Claims." *First Hartford*, 194 F.3d at 1289.

In his opinion finding a breach of contract in this case, former Chief Judge Smith did not address the issue of whether the Shareholder Plaintiffs could recover directly from the Government or whether all damages should be channeled through the receivership. *F.D.I.C. v. United States*, 47 Fed.Cl. at 6 n. 6. However, this question, along with the issue of whether the goodwill claims of Security as such may be litigated by the Shareholder Plaintiffs, has been effectively addressed by *First Hartford*. The Federal Circuit permitted shareholders to sue derivatively for a surplus in any recovery precisely because the shareholders must receive their share of any judgment through the receivership and not directly from the Government itself.

> The same principle applied in *California Housing* and *Branch* is equally applicable here. First Hartford, as a shareholder in [the bank] has a property interest in any liquidation surplus. The interest in that liquidation surplus is created by the statutory direction that, if funds remain after all depositors, creditors, and other claimants have been paid, the receiver is to distribute such funds to the depository institution's shareholders. *See* 12 U.S.C. § 1821(d)(11) (1994). This contingent interest is not materially distinct from the property interest in *California Housing* and *Branch* because in those cases, like here, a judgment favorable to the plaintiff would increase the assets of the depository institution and thus potentially enlarge any liquidation surplus to be distributed among the shareholders.

*First Hartford*, 194 F.3d at 1288. Moreover, if the Shareholder Plaintiffs were permitted to recover Security's goodwill damages directly against the Government either through a direct claim or derivatively through a "bifurcated" procedure outside of the receivership, the possibility of double recovery could exist if in fact damages could ever be recovered. As articulated in *Statesman:*

> To accept private plaintiffs' allegations that their claim can be considered outside the

rubric of receivership law would raise the possibility of double recovery. No question exists that the corporation, and therefore the receiver, is entitled to bring a claim for [the bank's] lost profits/lost equity value, but the court can award such damages only once. No authority authorizes the court to prorate the expectancy damages based on the degree of damage suffered by each party. *Statesman*, 41 Fed.Cl. at 17. Denying the Shareholder Plaintiffs the ability to pursue the goodwill claims of Security outside the statutory priority scheme, whether "derivatively," directly, or through a "bifurcation" device, is not unjust. "Although private plaintiffs may once have been the sole owners of [the bank], they are no longer. Having been displaced, private plaintiffs have no choice but to operate within the confines of the receivership priority system." *Statesman*, 41 Fed.Cl. at 18.

However, even if the Shareholder Plaintiffs were able to use bifurcation to pursue the goodwill claims of Security *for the benefit of* the FDIC, there are still several insuperable barriers to their proposal. First, while it is true that, as stated in *Suess v. United States*, 33 Fed.Cl. 89, 93 (1995), "where the government has taken over and dissolved the corporation, this need for the derivative suit is particularly apparent and perhaps even poignant," the shareholders were permitted to sue derivatively in this case, as stated above, for the limited purpose of protecting *their own interest* in any surplus recoveries. *F.D.I.C.*, 47 Fed.Cl. at 6 ("Shareholder plaintiffs have never hidden the fact that they are suing derivatively on behalf of the shareholders, and maintain their claim is 'direct' in the manner Judge Turner termed it: 'a direct, vested interest in the surplus of potential recoveries.' "). In *First Hartford*, shareholders of a failed bank were permitted to sue derivatively because it possessed "a potential liquidation surplus" in any recovery by the FDIC. *First Hartford*, 194 F.3d at 1296. Although the Shareholder Plaintiffs insist that the holdings of *Branch* and *California Housing* permit them to pursue Security's goodwill claims, in fact nothing in *Branch* or *California Housing* suggests that the scope of the shareholders' derivative status in this

case is any greater than the shareholder plaintiffs in *First Hartford*. *Branch*, 69 F.3d at 1574–75 ("A judgment favorable to the plaintiff in this case would increase the assets of [the bank holding company] and could result in a surplus that would benefit [the bank holding company's] shareholders."); *California Housing*, 959 F.2d at 957 n. 2 ("compensation to the corporation will result in a surplus in which the shareholder possesses a direct interest ...."). *See also First Hartford*, 194 F.3d at 1288 ("This contingent interest is not materially distinct from the property interest in *California Housing* and *Branch* because in those cases, like here, a judgment favorable to the plaintiff would increase the assets of the depository institution and thus potentially enlarge any liquidation surplus to be distributed among the shareholders.").

Because the Shareholder Plaintiffs have only a contingent interest in surplus recoveries, even if the Court were to permit them to sue the Government derivatively on behalf of the FDIC, in this instance bifurcation cannot solve the underlying standing issue that they seek to rectify. In the end, no matter whether the shareholders would be permitted to litigate the goodwill claims of Security on behalf of either Security or only for the shareholders' interest in the "surplus," the FDIC, as manager of the FRF, is still the legal owner of Security's claims and the FRF would still be able to pay itself with any judgment obtained in this case. In every instance the remaining surplus recovery for the Shareholder Plaintiffs would be zero because no viable theory of damages that exceeds the subrogated claim of the FRF–RTC exists. Thus, any attempt by the Shareholder Plaintiffs to proceed on the goodwill claims by bifurcating their claims from that of the FDIC would be an exercise in futility.

Finally, the Shareholder Plaintiffs cannot litigate the goodwill claims of Security derivatively and stay the FDIC's non-recoverable claims because the case or controversy issue is a component of subject matter jurisdiction and cannot be waived. *Sosna v. Iowa*, 419 U.S. 393, 398, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); *Landmark*, 256 F.3d at 1380. Standing must exist at every stage of *judicial*

proceedings. *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477–78, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990). Because there is no case or controversy between the Government and the FDIC with respect to the goodwill claims, the Court lacks subject matter jurisdiction to entertain these claims under any guise or otherwise stay the FDIC's non-justiciable claims. *Desktop Direct, Inc. v. Digital Equip. Corp.*, 993 F.2d 755, 760 (10th Cir.1993), *aff'd*, 511 U.S. 863, 114 S.Ct. 1992, 128 L.Ed.2d 842 (1994).

Therefore, there is no basis for the Shareholder Plaintiffs in this case to sue derivatively for anything more than their share of surplus recoveries or to otherwise pursue a direct claim against the Government through "bifurcation," because there will be no surplus recoveries. Likewise, the FDIC's goodwill claims cannot be stayed because, if it lacks standing to pursue its claims, such claims must be dismissed. The Shareholder Plaintiffs' motion to bifurcate must, therefore, be denied.[10]

## VIII. Miscellaneous Arguments

The FDIC argues that a case or controversy can be established by means of a controversy between it and the Shareholder Plaintiffs over the means for distributing any recovery. However, this Court possesses jurisdiction only to entertain claims against the United States. 28 U.S.C. § 1491(a)(1) (1994). The claim before this Court is that the United States breached its contractual obligations to Security Savings. The shareholders have not brought an actual claim before this Court that the United States has somehow deprived them of proceeds that it was entitled to under a distribution scheme. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 577, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("but under Article III, Congress es-

tablished courts to adjudicate cases and controversies as to claims. . . .") quoting *Stark v. Wickard*, 321 U.S. 288, 310, 64 S.Ct. 559, 88 L.Ed. 733 (1944). Nor can the FDIC remain in the case as a necessary party or as an intervener merely because the Shareholder Plaintiffs have a separate breach claim against the United States. As explained earlier, the Shareholders' goodwill claims are dependent on the resolution of the FDIC's claims, and because, in this case, there can be no surplus of recovery for the shareholders no matter whether the FDIC's claims are adjudicated or not, the FDIC cannot piggyback its non-justiciable claims onto the Shareholder Plaintiffs' non-viable claims. The FDIC's claims and the shareholders' claims, in this instance, must fall together.[11]

Finally, the FDIC argues that it must have standing to fulfill its statutory obligations to the receivership and claimants against it. *See e.g.* 12 U.S.C. § 1821(d)(2)(B) (duty to collect and administer assets), 12 U.S.C. § 1821(d)(11) (duty to distribute assets in accord with priority scheme), and 12 U.S.C. § 1819(a)(Fourth) (independent litigating authority). It cites *S.E.C. v. U.S. Realty*, 310 U.S. 434, 459–60, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940) for the proposition that it must remain in the case to pursue its statutory duties. In *U.S. Realty*, the Security and Exchange Commission ("S.E.C.") sought to intervene in a bankruptcy proceeding to insure that the proceeding took place under Chapter 10 of the Bankruptcy Code (which afforded the S.E.C. supervisory rights) rather than under Chapter 11 as sought by the debtor. The Supreme Court held that the district court properly allowed the S.E.C to intervene in the case in order to maintain its statutory authority over certain kinds of bankruptcy proceedings, even though the

---

**10.** The Shareholder Plaintiffs also maintain that this Court must resolve certain vague "due process" issues before dismissal of the contract claims. It is unclear to the Court exactly what due process issues are at stake in this case, but, in any event, the shareholders cannot enforce any rights to a contract with the United States in which they were not a party to the agreements that gave rise to the present action or are otherwise not in privity of contract with the United States. *Glass*, 258 F.3d at 1355.

**11.** The FDIC's argues that it has ancillary standing in this case because the FDIC's expectancy damage theory may be greater than the amount of the subrogated claim of the FRF–RTC. However, that argument is moot because there is no viable theory of recovery which would be greater than the subrogated claim of the FRF–RTC.

S.E.C. had no direct personal or pecuniary interest in the litigation.

There are, however, two key differences between this case and *U.S. Realty*. First and foremost, *U.S. Realty* did not involve a situation where a non-justiciable intra-governmental controversy presented itself. Second, had it not prevailed, the S.E.C. would have been prevented from fulfilling its statutory duties at the outset of the proceedings. However, the FDIC was in fact permitted to intervene in the Shareholder Plaintiffs' case *Bailey v. United States*, 92–817C, and was substituted as the Plaintiff and successor in interest to Security Savings in the present lead case. The FDIC has litigated this case pursuant to its statutory duties for some time. Therefore, *U.S. Realty* is inapposite.

Accordingly, all remaining goodwill claims of both the FDIC and the Shareholder Plaintiffs must be dismissed.

## IX. Takings

The Defendant argues that the FDIC's takings claims must likewise be dismissed. As of the date of this opinion, the FDIC has not provided the amount of damages suffered by a taking. If the FDIC cannot produce a plausible takings claim in excess of the FRF's subrogated claim, then the takings claim must likewise be dismissed. However, because the Court has already ordered briefings on the FDIC's and the Shareholder Plaintiffs' independent takings claims, the Court will not dismiss the FDIC's takings claim but will instead permit the FDIC to construct a takings theory that exceeds the subrogated claim of the FRF, if possible.

## X. Conclusion

The Defendant's motion for summary judgment is GRANTED in part. The Shareholder Plaintiffs' motion for bifurcation is DENIED. All goodwill claims that were not disposed of in the Defendant's motion for summary judgment are dismissed due to the absence of a case or controversy between the Federal Deposit Insurance Corporation ("FDIC") and the United States. Conse-

quently, the Shareholder Plaintiffs' contingent goodwill claims are extinguished.[12]

**IT IS SO ORDERED.**

---

12. Because all contract claims have been dismissed, the Defendant's motion for summary judgment based upon the FDIC's inconsistent statements and all motions in limine are denied as moot.